## Commonwealth *v.* Sloat, Appellant.

Argued September 30, 1929. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*H. W. Mumford,* with him *Everett Rosser,* for appellant.—There was no evidence introduced showing that actual crime was committed within the jurisdiction of the Court of Oyer and Terminer of Lackawanna Co. Neither was there testimony from which such an inference must be drawn: Com. v. Collins, 268 Pa. 295.

The remarks of the district attorney were improper: Com. v. Bruner, 11 Pa. C. C. F. 428.

The refusal to exclude witnesses from court room was error.

The remarks of the trial judge concerning testimony of defendant's witnesses were prejudicial.

*Harold A. Scragg,* District Attorney, with him *J. Julius Levy,* Assistant District Attorney, for Commonwealth.—The verdict establishes the venue: Com. v. Lawrence, 282 Pa. 128.

The remarks of the district attorney were not improper: Com. v. Shoemaker, 240 Pa. 255; Com. v. Shields, 50 Pa. Superior Ct. 23; Com. v. Meyers, 290 Pa. 573.

The separate examination of witnesses at the trial is a matter within the discretion of the court.

OPINION BY MR. JUSTICE SCHAFFER, November 25, 1929:

Appellant, found guilty of murder of the first degree with the penalty fixed at death, urges upon us that his conviction should be set aside: (1) because the Commonwealth did not establish the commission of the crime within the jurisdiction of the court, (2) because the district attorney made improper statements to the jury, (3) because the court on defendant's motion did not exclude certain of the Commonwealth's witnesses from the court room while another of its witnesses was testifying, (4) because of alleged prejudicial comments of the trial judge upon the testimony of witnesses called for the defense.

John Lowry, a taxicab driver in the City of Scranton, was slain on Saturday night, February 2, 1929. His dead body, partly buried in the waters of a shallow stream, was not discovered until two weeks later, on February 16th. It was convincingly shown that on the day of his disappearance appellant was in Scranton, where he had arrived the preceding Wednesday, taking quarters in a rooming house under an assumed name. On Friday defendant notified his boarding mistress that he intended to leave the next day and on Saturday night about nine o'clock he handed her the latchkey of the house, saying that he was going out to telephone and asked permission temporarily to leave his suitcase in the hall. She did not see him again, but shortly after his departure she saw an arm reach in the doorway and remove the suitcase. At three minutes past nine on Saturday night an employee of a taxicab concern in Scranton received a telephone call requesting that one

of its cabs should be sent to the corner of Adams and Olive Streets. The lodging house where the defendant was staying was a few doors from this corner. John Lowry, the deceased, was directed to comply with the call and departed from the garage in his maroon-colored Willys-Knight taxicab. He has not since been seen alive. Sometime later a car answering the description of his was observed unoccupied on the public road in the near vicinity of the place where his body was subsequently found. On Tuesday, February 5th, the taxicab was discovered in a large ravine in a woods 175 yards from the highway at Runnemede, New Jersey, about nine miles from Philadelphia. There were blood stains in the car.

Ralph Russell Sloat lived with Julia Flesher in a rooming house on Summer Street in Philadelphia. They were not married. She testified that he had gone away on Wednesday, January 30th, and on Friday, February 1st, she received a special delivery letter from him mailed in Scranton. On Sunday morning, February 3d, between 3:30 and 4 o'clock, she was awakened by a knock at her door and by the defendant calling her name. She admitted him and they talked. In the course of the conversation he told her he had stolen a car. They went to bed and he set the alarm clock for 5:30, at which time they were awakened and he told her to dress. Together they left the house, got in the car, which he said he had stolen, drove to the ferry, crossed the Delaware River to Camden, and from there proceeded to Runnemede, where he drove the car into the ravine, where it was found two days later. When they got out of the car, he told her he was going to burn it, but she persuaded him not to, as it was getting light and the fire would be seen. They walked from where they had abandoned the car to the highway and by bus proceeded back to Philadelphia.

Lillian Sloat, sister of the appellant, lived in Camden with Edward Saunders. They were not married. They had formerly lived in Scranton, whence she departed

with Saunders, deserting a husband and child. She was employed as a waitress in a restaurant and Saunders worked in a restaurant some distance away. Between 5:30 and 6 o'clock in the evening of Monday, February 4th, Saunders went to the restaurant where Lillian worked. They both testified that about an hour later Ralph Sloat, the defendant, entered, spoke to his sister and Saunders and the three of them sat at a table, and Ralph Sloat told them he had just come from Scranton and that his sister's deserted husband was coming to Camden to arrest her and Saunders, and he advised them to leave town. The conversation was an extended one and in the course of it Sloat told his sister and Saunders that in order to get out of Scranton "he had to knock a son-of-a-bitch off," that he had killed him in his automobile and buried him in a creek on the West Mountain, covering his body with rocks, and left the feet sticking out of the water, as it was so cold he could not complete burying it. The reason he gave for killing him was that when he ordered him to stop, the deceased "stepped on the gas" to go faster and he thought he was going to take him to the city hall and "turn him in." It was arranged between Sloat and Saunders that the latter should rob the cash register in the restaurant where he was working to enable him and Sloat's sister to get out of Camden, as they had no funds. This accomplished, the three of them went to the house in Philadelphia where the defendant was living with the Flesher woman, whence Saunders and Lillian Sloat went to Newark, New Jersey, where they remained for several days, returning to Camden, at which place they were taken into custody on February 14th. The defendant and Julia Flesher were arrested in Philadelphia the same night shortly after midnight. When interrogated by the detectives, Saunders, fearing that he would be charged with the murder, told of the conversation they had with the defendant, and, as a result of the information thus received, one of the detectives who was from

Scranton telephoned there on the 15th, stating where the body of Lowry might be found, and it was discovered on the 16th in a stream on the West Mountain where appellant said he had buried it. ·

In view of the testimony, we fail to see how it can be said that it was not shown that the crime was committed within the jurisdiction of the court in Lackawanna County. Sloat was shown to have been in Scranton on that night. Lowry, the deceased, drove a maroon Willys-Knight taxicab from the garage a few moments after 9 o'clock, and such a car was observed between 9:30 and 9:45 unoccupied on the roadside near where the body was found. The defendant told his sister and Saunders that he shot the deceased shortly after he entered the latter's taxicab, that he stopped the car and buried the body in a creek on the West Mountain (in Lackawanna County) near where the killing took place, and this information being telephoned to Scranton by the detective to whom Saunders related what Sloat had told him, the body was found at the place and in the condition in which the latter said he had left it. "Had it affirmatively appeared, either on the face of the indictment.... or after the evidence was in that the crime had been committed outside the territorial jurisdiction of the court that tried it......the question would be an entirely different one. But where the sole objection is that it does not affirmatively appear the crime was committed in the county in which the defendant is indicted and tried, the vedict of guilty cures such an omission and of its own force includes a finding to that effect": Com. v. Lawrence, 282 Pa. 128, 133.

As to the allegation that the remarks of the district attorney prejudiced the case of the defendant, it is not manifest to us how they could have done so. The defendant did not take the stand to deny the testimony launched against him. Evidently by innuendo his counsel in argument had been endeavoring to give the impression that Saunders may have committed the crime,

although there was no evidence of this and no proof even that he was in Scranton when the murder took place. To meet this insinuation, the district attorney in his argument said something to the effect that the Commonwealth knew and could prove where Saunders was on the 2d day of February, 1929, and that the defendant's counsel knew where he was. When counsel for the defense step outside the evidence for argument, they invite replies likewise beyond the proven facts. The trial judge said that he believed what was said by the district attorney to be a legitimate reply argument to that of counsel for the accused and we are not convinced that it was not.

As to the contention that it was error not to exclude the Sloat and Flesher women from the court room when Saunders was testifying it is sufficient to say that this was a matter within the sound discretion of the trial judge.

Two witnesses testifying in defendant's case had said that on the afternoon of February 3d they passed the place where Julia Flesher said she and Sloat had left the taxicab in the ravine and it was not there. It appeared that the two men had a bottle of whiskey and went off the main road to drink some of it. In comment the court said, "On that Sunday previous to the cab being found on Tuesday and on the Sunday when Julia Flesher says they planted the car in the ravine, they were on their way to visit the sick, and passing the home of the invalid they had a bottle of whiskey. They didn't want the inmates of the home to see that and they stepped off the highway into the woods. Now, assuming that they did that, the chief of police said they found this car 175 feet from the highway; assuming that they did step off the highway to take this drink quietly and privately so no one would see them, did they step 175 feet into the woods? Did they go into the woods far enough to see this car that under all the testimony was hidden in that ravine? If it be true that that car was

not there on Sunday afternoon, and Julia Flesher said that it was there Sunday morning just at daylight, then you can see how important that testimony is to discredit Julia; and that is the purpose of it." We think this fair comment under the circumstances. The witnesses' minds may have been more focussed upon taking the drink than upon their surroundings and for this reason they may not have observed the car.

None of the four propositions advanced to us would warrant setting aside the finding of the jury and awarding a new trial and therefore the assignments of error must be and they are overruled.

The judgment of sentence is affirmed and the record remitted to the court below for the purpose of execution.