## Commonwealth *v.* Turner, Appellant.

418

Argued April 14, 1952. Before DREW, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Edwin P. Rome,* for appellant.

*Richardson Dilworth,* District Attorney, with him *Thomas M. Reed,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE CHIDSEY, May 29, 1952:

The defendant, Aaron Turner, appeals from his conviction of murder in the first degree committed during the perpetration of a robbery, with sentence of death fixed by the jury. Motion for new trial was denied by the court *en banc.* This was defendant's third trial for the offense. Each of two earlier trials had the same outcome, but the similar sentences imposed were successively set aside for trial errors. As to the first trial see *Turner v. Pennsylvania,* 338 U. S. 62, 69 S. Ct. 1352, reversing the decision of this Court reported at 358 Pa. 350, 58 A. 2d 61. For the reversal of sentence in the second trial see *Commonwealth v. Turner,* 367 Pa. 403, 80 A. 2d 708.

In reversing the first conviction, the Supreme Court of the United States held that an alleged confession reduced to writing and signed by Turner while in the

420

custody of police was inadmissible because obtained by their coercive influence. This Court in reversing the second conviction felt constrained to hold equally inadmissible for the same reason the admission of guilt made by Turner at a preliminary hearing held during the course of the obtaining of the condemned confession.

At the present trial, in accordance with these rulings of the United States Supreme Court and of this Court, evidence of the confession and admission above mentioned was not adduced and the Commonwealth's case rested solely upon the testimony of a self-confessed accomplice and the testimony of two detectives, members of the Philadelphia police force, as to an alleged statement made by the defendant while in custody but claimed by the Commonwealth to be free from any compulsion.

The Commonwealth produced evidence from which the jury could have found the following facts. In the afternoon of December 15, 1945, Frank Endres, about 63 years of age, and Charles Simmons, about 53 years of age, were in the Ace Broom Factory owned by Simmons and located at 353-55 North Second Street, Philadelphia. At or about five o'clock in the afternoon a police officer by the name of Monaghan who was patrolling the neighborhood to try doors and see whether they were locked, found the factory door unlocked, entered and found the bodies of Endres and Simmons lying on the floor in pools of blood. Both were unconscious and never regained consciousness. There was blood on brooms that were stacked against the wall nearby. The two men were taken to the hospital by the police; Endres died two days later and Simmons on December 21st. Dr. Wadsworth, the coroner's physician, who performed an autopsy, testified that Endres died as a result of a crushed skull; and Simmons of multiple in-

juries to the head, and that the injuries to both men had apparently been inflicted by a blunt instrument. There was testimony that pockets of the two men were turned inside out. Mrs. Simmons testified that her husband often carried several hundred dollars on his person. There were no eye witnesses to the crime and no one was seen entering or leaving the factory at the time of its perpetration.

On May 24, 1946, the police arrested one Clarence Lofton and on June 3rd arrested the defendant Turner and one Jasper Johnson. The three were charged with the crime and jointly indicted for the murder of Endres. The three trials of Turner were on this indictment. Johnson was separately tried thereunder and convicted of murder in the first degree with sentence of death, but his conviction, upheld by this Court, (see 365 Pa. 303, 74 A. 2d 144), was set aside by the United States Supreme Court on November 13, 1950 without opinion in an order citing its decision in the *Turner* case, 338 U. S. 62, supra. Lofton pleaded guilty and the lower court sentenced him to life imprisonment. Thereafter he testified as a witness for the Commonwealth in the second and third trials of Turner.

At the third trial of Turner now here for review, in order to connect him with the commission of the crime, the Commonwealth relied upon the testimony of Lofton and that of two police detectives, Thompson and O'Mahoney, who testified that on June 6, 1946 they had secreted themselves in a cell adjoining that occupied by Turner, Johnson and Lofton and overheard the three men talking. Thompson testified, "Turner said he had a hell of a time with the second man. He hit him pretty hard twice and blood came out of his ears." O'Mahoney's testimony is as follows: "A. The voice I heard sounded like Jasper Johnson's voice. He said 'Hey, Tree, [Turner's nickname was "Treetop"] why are the

detectives asking all them questions?' There was reference made to something about a broom factory. The answer came back 'I had to hit the second fellow—Q. Who said that? A. This defendant, Aaron Turner. Q. What did he say? A. He said 'I had to hit the second fellow awfully hard twice and the blood came out of his ears.' ".

Defendant's counsel objected to the admission of this testimony by the two detectives on the ground that the alleged utterance by Turner was made during an inherently coercive period of detention, and was just as inadmissible as his written confession and the oral admission made by him at the preliminary hearing, the introduction of which at the earlier trials was condemned on appeal in the cases above cited as a denial of due process under the 14th Amendment of the Federal Constitution. The trial judge overruled the objection. The admission of this evidence is here assigned as error. We cannot agree that the inculpatory utterance by Turner, made in conversation with a friend and fellow prisoner when unaware that the conversation was being overheard, falls into the same category as the written confession and oral admission, both of which were made as the direct result of or in response to police interrogation.

The written confession, condemned by the Supreme Court of the United States, was the direct result of interrogation by relays of police officers. In our opinion declaring the oral admission made at the preliminary hearing inadmissible, we stated that "The only persons present at this hearing were the same police officers who had engaged in . . . [the] questioning, the magistrate and an assistant district attorney.", and these officers who brought him to the hearing, took him back for the completion of his "confession". We held under these circumstances that since the United

States Supreme Court had held that the confession was obtained under coercion, the interlude of the preliminary hearing must be considered also tainted therewith.

While Turner was questioned by the police from the time of his arrest and on June 6th when the challenged utterance was made, he repeatedly denied his guilt until late on the night of June 7th when he admitted the killing. In other words, for a very considerable length of time after the conversation in question between Turner and Johnson, the defendant repeatedly asserted his innocence. The inculpatory utterance therefore clearly was not the result of police pressure but unquestionably a voluntary statement made in supposed secrecy to his fellow prisoner. Necessarily appellant's argument reduces itself to the generality that *all statements* made by an accused during a period of illegal detention must be excluded regardless of to whom or under what circumstances they are made. For this proposition appellant's argument is based upon *Turner v. Pennsylvania*, 338 U. S. 62 and *Watts v. Indiana*, 338 U. S. 49. But neither of these cases in their language or implications go so far.

The gist of the United States Supreme Court decisions in the *Turner* and *Watts* cases is that a confession obtained by the police by means of mental torture cannot be used to convict the imprisoned confessor. In the *Watts* case the United States Supreme Court said: "A confession by which life becomes forfeit must be the expression of free choice. A statement to be voluntary of course need not be volunteered. But *if it is the product of sustained pressure by the police it does not issue from a free choice.* When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is

plainly the product of the suction process of interrogation, and therefore the reverse of voluntary." (Emphasis supplied).[1]

*Ashcraft et al. v. Tennessee,* 327 U. S. 274, relied upon by appellant, is clearly distinguishable from the present case. In a previous appeal by the same defendant (322 U. S. 143) the Supreme Court outlawed the use of a confession made by the defendant in response to police interrogation, declaring it had been coercively obtained. At the second trial the condemned confession was not used but oral admissions made by the defendant while the confession was being obtained were permitted to be introduced into evidence. It was this error which was corrected by the United States Supreme Court in *Ashcraft v. Tennessee,* (327 U. S. 274). Mr. Justice BLACK stated at p. 277: "Construing our mandate as prohibiting only the admission of the written unsigned confession, the trial judge allowed the jury to listen to testimony narrating everything else that took place during the entire 36 hours Ashcraft was questioned *with no one present but his inquisitors*

---

[1] The concurring opinion of Mr. Justice DOUGLAS in *Watts v. Indiana,* supra, p. 57, is the only indication of support for appellant's viewpoint, for Mr. Justice DOUGLAS there says, "We should unequivocally condemn the procedure and stand ready to outlaw, as we did in Malinski v. People of State of New York, 324 U. S. 401, 65 S. Ct. 781, 89 L. Ed. 1029, and Haley v. State of Ohio, 332 U. S. 596, 68 S. Ct. 302, 92 L. Ed. 224, any confession obtained during the period of the unlawful detention." The dissenting opinion of Mr. Justice JACKSON in the same case shows that Mr. Justice DOUGLAS stands alone in this conclusion, for Mr. Justice JACKSON there says, p. 58, "[The] concurring opinion, however, goes to the very limit and seems to declare for outlawing any confession, however freely given, if obtained during a period of custody between arrest and arraignment—which, in practice, means all of them." We are thus strengthened in our opinion that the majority decision of the Supreme Court of the United States in *Watts v. Indiana* not only fails to support the position taken by the appellant here, but in its implications militates against such position.

*and those summoned by them to buttress their future evidence."* (Emphasis supplied).

Thus in the *Ashcraft* as well as in the *Turner* and *Watts* cases, the Supreme Court forbade the use of confessions and admissions made in response to relentless interrogation *by the police* under circumstances held to be inherently coercive. These cases do not hold that no utterance is admissible if made during a period of illegal detention. Indeed our conclusion is in accord with a very recent pronouncement of the United States Supreme Court. In *Gallegos v. Nebraska,* 342 U. S. 55, 72 S. Ct. 141 (1951), the petitioner was held in custody without counsel or any preliminary hearing for a period of twenty-four days. During this time he gave two confessions, the first on the fifth day of detention and the second on about the thirteenth day of detention. The Supreme Court held that both confessions were admissible because it was not satisfactorily shown that they were the products of coercion. It is noteworthy that Turner did not claim in his own testimony that the alleged statement was made by him under fear or compulsion, *but he denied that he ever made the utterance.* We are of the opinion that its admission into evidence did not violate his constitutional rights.

The second contention of appellant is also referable to this testimony. It concerns the trial judge's charge. The court charged: "You will consider with caution all the evidence surrounding this alleged occurrence. If you find they [the detectives] could not hear any remarks made by the defendant, or that they did not correctly testify as to what they heard him say, or that you do not believe them, or that they were activated by malice, you may completely ignore their testimony." Counsel for the defendant submitted the following point for charge which was refused: "What you have heard here from the detectives about the supposed statement

made by the defendant in the cell room is to be taken with caution for that is the weakest and most suspicious kind of evidence known to the law. Such evidence is almost always misreported—whether through ignorance, inattention, or malice, and the words supposed to have been said by the defendant are extremely liable to misconstruction. In deciding whether defendant made that statement in the cell room, your suspicion should be aroused and your caution stimulated." It is our opinion that the trial judge in substance properly charged the jury with reference to this testimony. The only thing which appellant sought was to have the trial judge amplify his charge. *Commonwealth v. Giovanetti*, 341 Pa. 345, 19 A. 2d 119, relied upon by appellant, is distinguishable. There testimony by a detective as to the questions asked defendant and her answers thereto was an issue, together with the interpretation of the answers and defendant's understanding of the questions. In the instant case there can be no misinterpretation of the words purportedly used by Turner, and in addition to this the trial judge was not required to use the very words of the opinion writer in the *Giovanetti* case, supra.

We are confronted with a serious question again arising out of the testimony given by the two detectives with respect to the alleged utterance by the defendant. Without this alleged damaging statement by the defendant, the Commonwealth's case rested solely on the uncorroborated testimony of Lofton, a self-confessed accomplice. If Turner made the statement, it had crucial bearing not only on his guilt or innocence, but if found guilty, on the punishment to be fixed by the jury—life imprisonment or death. Thus the credibility of the two detectives was a matter of very great, if not paramount importance. The defendant denied that he made the statement, and he was entitled to employ every legal means for testing the credibility of

these witnesses.  To this end counsel asked that each of the two detectives be excluded from the court room when the other was testifying.  The Commonwealth called Thompson first, and before he testified defendant's counsel addressed the court, saying, ". . . May I request that during the testimony of Detective Thompson, that Detective O'Mahoney be asked to leave the Court Room so as not to overhear the testimony of Detective Thompson?  It is in line with the earlier argument that I made.  It is not something that would create an unusual problem."  The argument referred to was made in support of a petition praying for segregation of the Commonwealth's witnesses, presented two days prior to the commencement of the trial, and appears of record as follows: "Detectives Thompson and O'Mahoney testified fully in the first trial, because they were the police officers that investigated and tracked it down.  In the second trial they testified again, and for the first time testified to having overheard conversations in the cell room that went to the heart of the case.  They admitted they had not spoken of that before. . . It would give us opportunity to cross-examine each witness in turn regarding the detail of that, and if the second man is in the Court Room I submit the defendant has not adequate opportunity to cross-examine under the circumstances."  The court refused the request made and granted the defendant an exception, stating, "I think you would be establishing a bad precedent if that were permitted.  It is only in extraordinary cases where witnesses may be separated from one another.  I do not think this case is in that category."

The practice of excluding a witness from the court room in order to prevent the shaping of his testimony to correspond with that given earlier in the trial and to detect false testimony has long existed.  In discussing the subject of sequestration of witnesses, Wigmore,

who states that the practice crossed the water with the common law, says (Wigmore on Evidence, 3rd Edition, Vol. VI, §1838, p. 354): "But when all allowances are made, it remains true that the expedient of sequestration is (next to cross-examination) one of the greatest engines that the skill of man has ever invented for the detection of liars in a court of justice. Its supreme excellence consists in its simplicity and (so to speak) its automatism; for, while cross-examination, to be successful, often needs the rarest skill, and is always full of risk to its very employers, sequestration does its service with but little aid from the examiner, and can never, even when unsuccessful, do serious harm to those who have invoked it.", and at p. 357 says: "It seems properly to be demandable as of right, precisely, as is cross-examination. In the first place, it is simple and feasible. In the next place, it is so powerful and practical a weapon of defense that no contingency can justify its denial as being a mere formality or an empty sentimentality. In the third place, in the case when it is most useful (namely, a combination to perjure), it is almost the only hope of an innocent opponent. After all is said and done, the fact remains (as Sir JAMES STEPHEN has declared, out of a lengthy experience as a criminal judge) that successful perjury is always a possible feature of human justice. No rule, therefore, should ever be laid down which will by possibility deprive an opponent of the chance of exposing perjury." In 1 Chamberlayne, Modern Law of Evidence (1911), p. 248 it is stated: "The expedient of separation is one which readily suggests itself and has been a common feature of trials by witnesses from earliest times. Separation is a test of truth. If it prevents successful perjury, conscious or unconscious collusion between witnesses on the same side or undue advantage in antagonizing witnesses on the other side, the small loss of time or trifling incidental inconvenience are well repaid."

While in some jurisdictions segregation of witnesses is demandable of right, in most jurisdictions the question is left to the discretion of the trial judge. In Pennsylvania it has long been established that the trial judge has the power to permit sequestration of witnesses: *Commonwealth v. Principatti*, 260 Pa. 587 at 598, 104 A. 53; and that it is a matter within the discretion of the trial judge: *Commonwealth v. Sloat*, 298 Pa. 10, 147 A. 834. In the present case the trial judge recognized that he possessed the power to grant the request for segregation, but in our considered view his denial of the request was an abuse of discretion.

We can conceive of no case more appropriate or compelling for the sequestration of witnesses than that under the facts and circumstances here presented. Nothing could have been more telling against the defendant than the alleged statement by him that he had to hit one of the men who were killed a second time and so hard that the blood came out of his ears. That he made such a statement depended entirely upon the testimony of the two detectives. No legal test of their credibility should have been denied. An examination of the record reveals that the testimony of O'Mahoney, who succeeded Thompson to the stand, was a repetition of the latter's testimony in all essential details. It may be said that the harmony in their testimony supported their veracity. If their testimony had been the same if given by each in the absence of the other, this conclusion would be fortified. On the other hand, if, as suggested, they had combined to manufacture testimony to take the place of the excluded confession, the refusal of their sequestration deprived the defendant of, as Wigmore terms it, ". . . one of the greatest engines that the skill of man has ever invented for the detection of liars in a court of justice." We are not passing upon the truthfulness or accuracy of the testimony of the two

witnesses. That is a jury function. Their stories may have been entirely truthful.[2]

In holding, as we do, that a proper exercise of discretion by the trial judge required the sequestration specifically requested in this case and that the refusal of the request was reversible error, our ruling is not to be construed as making a generic change in the established practice in this Commonwealth of permitting the presence in the court room of prospective witnesses. In this connection the court below properly refused the blanket request of counsel to exclude all witnesses made before the trial without assigning any reason for such general exclusion. A request for sequestration of a witness or witnesses should be specific and be supported by some reason.

The next error alleged is the trial judge's refusal to permit counsel for Turner to show by the court stenographer at Lofton's trial on a guilty plea that the district attorney there said that Lofton had assisted the police in solving other murders and that it was the recommendation of the district attorney that life imprisonment be the penalty rather than death. On cross-examination of Lofton the following questions were asked him: "Q. Do you remember Mr. McClain,

---

[2] In attacking their authenticity counsel for the defendant points to the circumstance that in the first trial of Turner when the Commonwealth pressed for a verdict of first degree murder with the death penalty, neither of these men, both of whom testified at that trial, mentioned this damning statement and that neither of them made reports of this alleged incident, which would have constituted an important "break" in the case, to their superiors in charge of the investigation of the crime. While they testified that when they overheard the statement alleged to have been made by Turner, Lofton and Johnson were in the same cell with Turner, Lofton who did not hear Thompson and O'Mahoney on the stand, denied that he was ever in a cell with anyone during the period of his custody.

the Assistant District Attorney at your trial before Judge LEWIS, telling the Court that you had been of great assistance to them—meaning the police—in solving other matters and other murders in the City of Philadelphia? You gave them information that helped them solve those murders. Do you remember Mr. McClain stating 'Under those circumstances if Your Honors do determine that this is murder of the first degree, then the District Attorney's Office would feel constrained to recommend that the penalty of life imprisonment be inflicted rather than the death penalty'? A. Did you say McClain said that? Q. Didn't he say that in your presence to Judge LEWIS? A. I did not hear him say that. I don't know where you got that. He did not say that in my presence." Thus Lofton had at least in one portion of his testimony categorically denied that the statement had been made. The purpose of the proof of what the district attorney said was therefore two-fold—first, to contradict Lofton's testimony that the statement had not been made and second, to show bias on the part of Lofton, both going to his credibility.

Again the importance of the credibility of another vital witness makes this ruling error and we conclude that the error was not harmless as the Commonwealth contends. Lofton's testimony was necessary for a conviction. Counsel for Turner was entitled to impeach his veracity by this means. The evidence also was admissible to show that Lofton was biased. The fact that the district attorney recommended in Lofton's presence that he be given a life sentence was certainly relevant evidence from which the jury could infer that Lofton was biased and testified against Turner because of this recommendation or because of hope of future favors, albeit the district attorney never promised or intimated such favors.

Another complaint of the appellant is that the trial judge was in error when he charged, "In the trial it is proper for the District Attorney and the Trial Judge to refer to the cause of the death of Charles Simmons who was struck and suffered a crushed skull from which he died, where the blow was inflicted at the same place, with the same or similar weapon, and in the course of the same criminal undertaking. . . The Jury may consider this evidence if after you have found the defendant guilty of murder of the first degree beyond a reasonable doubt. You are then contemplating and considering the character of the defendant in fixing the penalty." Appellant also relies upon the trial judge's refusal of the following point for charge: "If you conclude beyond a reasonable doubt that the defendant is guilty of first degree murder in the killing of Endres, the fact that Simmons was also killed has no proper place in your deliberations as to penalty and is not to be considered by you in your deliberations as to penalty. . .". The testimony regarding the death of Simmons was commented upon by this Court in *Commonwealth v. Johnson,* 365 Pa. 303, 306, 74 A. 2d 144, where this Court said, "Johnson's first complaint on this appeal is in regard to the references made during the trial, both by the district attorney and the trial judge, to the murder of Charles Simmons; also that the coroner's physician was allowed to testify concerning his autopsy on the body of Simmons and his finding that injuries to the head had caused Simmons' death. It can scarcely be seriously argued that mention of Simmons and the manner of his death should, or could, have been eliminated from the trial since the assaults on Endres and Simmons were made at the same time, with the same weapon, and in the course of the same criminal undertaking. No coherent narrative of the event could have excluded the facts as to the entrance into the room of Simmons and the attack upon him immediately after

the assault upon Endres, the robberies from both their bodies, and the flight of the three conspirators from the scene. It all occurred at the same place and time." Thus no valid objection could have been made to the admissibility of the testimony adduced at this trial regarding Simmons. Appellant argues that since *Commonwealth v. Johnson,* supra, was reversed by the Supreme Court of the United States (340 U. S. 881), it is not clear whether the admission of such evidence relating to Simmons' death was considered violative of the due process clause under the 14th Amendment and therefore was possibly included in that court's *ratio decidendi.* We do not agree with this expanded interpretation of the reversal by the United States Supreme Court. Although that court reversed without opinion, its decision in the *Turner* case (338 U. S. 62, supra) was cited in its order which makes it apparent to us that the sole basis for the reversal was the admission of Johnson's confession.

However, since this case must be retried, we are compelled to point out that it was erroneous for the trial judge to charge that the jury could consider the evidence relating to the death of Simmons *in its determination of whether the penalty should be life inprisonment or death.* The refusal of the point for charge magnified this error. This question is ruled in principle by the case of *Commonwealth v. John Jones,* 355 Pa. 594, 50 A. 2d 342, where this Court, in accordance with previous decisions, held that evidence of arrests for prior crimes without convictions was not admissible. It was there said by Chief Justice Drew, p. 597, "It is well settled that evidence in proper form of prior convictions of crime is admissible in homicide cases, for the sole purpose of aiding the jury in determining the penalty to be inflicted if it finds the accused guilty of murder in the first degree, where the accused is an habitual criminal of the type who kills for mercenary

purposes or where the killing is the result of sordid passion: (citing cases). A similar rule permits the admission, in certain types of homicide cases, of statements or confessions in which the accused admitted the *actual commission* of other crimes to aid the jury in fixing the penalty in a case of murder in the first degree: (citing cases). The reason for the admission of such evidence was made clear in Commonwealth v. Dague, [302 Pa. 13] supra, where we said: '. . . to enable the jury to know what manner of man the defendant was, if they should find him guilty of murder of the first degree, when it came to the exercise of their discretion on the question of his punishment. . .' The appellate courts of this Commonwealth have strictly limited the application of this rule of evidence to certain cases involving either prior *convictions*[3] or admissions by accused of the actual commission of other *crimes* and any attempt to extend this principle to include testimony of *mere arrests* is without foundation in either law or reason." (Emphasis by the Court).

The Act of May 14, 1925, P. L. 759, as interpreted by this Court allows evidence of prior convictions so that ". . . the jury may have before it the past deeds of the accused that it may be fully advised of his nature and deserts when it fixes the penalty. . .": *Commonwealth v. Kurutz*, 312 Pa. 343, 168 A. 28; *Commonwealth v. Dague*, 302 Pa. 13, 152 A. 839. But prior convictions and admissions or confessions are only admitted on the question of penalty because they are relevant as proof of acts *committed by the accused.* Thus in order for the testimony regarding Simmons to be relevant on the question of penalty, the jury would

---

[3] The question of whether prior convictions *should be* admitted, as a matter of policy, *during the trial* of a first degree murder case has been the subject of great discussion: *Commonwealth v. DePofi*, 362 Pa. 229, 66 A. 2d 649; Wigmore on Evidence, 3rd Edition, Vol. I, §194(b).

have to find that *Turner committed the killing of Simmons*.[4] But Turner was not, in this case or any previous case, tried for the murder of Simmons. Any decision which would permit the jury to consider this testimony regarding Simmons' death on the question of penalty would therefore force Turner to defend against that crime as well as the killing of Endres. We think it unwise to alter the rule laid down in *Commonwealth v. John Jones*, supra, that strictly limits evidence of other crimes on the question of penalty to prior convictions, confessions or admissions.

The Commonwealth relies upon *Commonwealth v. Petrillo*, 338 Pa. 65, 12 A. 2d 317, and *Commonwealth v. Ferrigan*, 44 Pa. 386. In neither of these cases was the question of the right of the jury to consider evidence of another crime *for the purpose of fixing the penalty* considered. The question involved in those cases was whether evidence of other crimes was *admissible* to prove *motive* for murder.

Matter dehors the record may indicate the defendant's guilt of this shocking crime, but our review is

---

[4] In the *Johnson* case (365 Pa. 303, supra), Johnson's confession which was admitted into evidence, contained an account of what happened inside the factory while the robbery was being committed. In the present case, to the record of which our consideration is limited, there is no such evidence. The testimony of the accomplice Lofton who claimed to have remained outside as a lookout, revealed nothing as to what occurred *inside the factory*. Johnson could have struck and incapacitated one of the assaulted men and Turner disposed of the other. Turner's statement, alleged to have been overheard by the two detectives, does not definitely identify "the second man" that he had to hit twice. Whether Johnson or Turner inflicted the fatal injuries upon the two victims or either of them would be immaterial in sustaining a conviction of both Johnson and Turner of murder in the perpetration of robbery, but it cannot be said with certainty that the permitted assumption by the jury that Turner not only killed Endres but Simmons as well, played no part in their fixing the death penalty.

confined to the immediate record. It is unfortunate that there must be another trial of the case, but it would be more unfortunate if we condoned serious trial errors and thereby established precedent for the destruction of safeguards that insure every accused of a fair trial under our system of criminal justice.

The judgment is reversed and a *venire facias de novo* is awarded.

Mr. Justice ALLEN M. STEARNE and Mr. Justice BELL dissent.