## Commonwealth v. Keller

*Alvin B. Lewis, Jr.*, for Commonwealth.

*L. E. Meyer*, for defendant.

GATES, P. J., August 19, 1964.—Violet Miller Keller married Elton Ray Keller on June 29, 1957, and she was not divorced from him until the first week of December, 1963. From 1961 until the time of the trial, Elton Ray Keller was in the military service, and the parties were living separate and apart from each other. From August of 1961, defendant had illicit and regular sexual relations with one Roy Schaeffer. In April of 1962, defendant secretly gave birth to a female child which, defendant said, was born dead. She wrapped the dead body in a towel and wrapped a plastic sheet around the towel and put the body in this manner into a paper carton and put the carton on a shelf in the basement of the premises wherein she had her apartment, where the body remained until discovered in August of 1963. When found, the body was badly decomposed, and only small pieces of skin and bones remained. Inside the box was evidence of the presence of maggots. A forensic pathologist examined the remains, but, due to the extensive decomposition of the body, he was unable to determine the cause of death or whether the child was born dead or alive. Defendant never told anyone of her pregnancy or of the birth of this child, neither did she tell

anyone what she had done with the child before she was arrested.

In March of 1963, she again gave birth to a child secretly in the bathroom of her apartment, after leaving her bed, which she was then sharing with Roy Schaeffer. She signed a confession, wherein she stated that the child was born alive, and that she put the child's head into the commode, intending to drown it. Using bathroom towels, she cleaned the blood from the floor and put the towels and the body of the dead baby in a sanitary napkin box and stuffed other towels in the box and put the box in the bathroom closet. This was in the early morning hours of March 15, 1963. She did not tell Roy Schaeffer or anyone else what had happened or what she had done with the child's body. Later in the day, she was taken to the hospital, and, at first, denied having recently given birth to a child and did not admit it until the child's body was discovered as a result of a police search of her apartment on March 23, 1963.[1]

Following the discovery of the bodies of these dead children, defendant was indicted for adultery and two counts of a common law misdemeanor, characterized as the "indecent disposition of a dead body." Following a three day trial, defendant was convicted on all three charges. In due course, defendant properly filed a motion in arrest of judgment and a motion for a new trial. Defendant assigns as a reason in support of her motion in arrest of judgment that the evidence was insufficient to sustain the verdict of the jury. In

---

[1] Defendant was prosecuted for murder as a result of this confession. However, the Commonwealth was unable to establish the corpus delicti, because the pathologist testified that his autopsy produced no evidence that the child was born alive. He did testify that the child did not die from drowning. The confession, therefore, was rendered inadmissible, and the Commonwealth thereby unable to make out a case of infanticide.

support of her motion for a new trial, defendant assigns the following reasons:

1. The verdict is contrary to the evidence;

2. The verdict is contrary to the weight of the evidence;

3. The court erred in the admission of the confession of defendant taken while she was illegally arrested and detained.

Although defendant requested the right to file additional and supplemental reasons for a new trial after the notes of testimony had been transcribed, and we granted 20 additional days within which to do this, no additional reasons were filed. Thereafter, the matter was set down for argument, and written briefs have been submitted to us. In defendant's brief, she advances reasons for a new trial which were not set forth in her motion, but we will consider them out of an abundance of precaution, and, since at least one reason, if sustained, would be fundamental error requiring a new trial.

For guidance in the future, we would like to point out that, where a defendant files a motion to quash the indictment, and it is overruled by the court, and, thereafter, the matter goes to trial and judgment, if the defendant seeks to raise the issues given in support of the motion to quash the indictment, the motion for a new trial or the motion in arrest of judgment should assign as a reason therefor that the court erred in overruling the defendant's motion to quash the indictment. So also, if, at the close of the Commonwealth's case, defendant demurs to the Commonwealth's evidence and assigns reasons therefor, and the demurrer is overruled, the subsequent motion for a new trial and in arrest of judgment should assign as reasons therefor that the court erred in refusing to sustain defendant's demurrer.

From the present posture of the record, and from defendant's brief, the following issues are raised:

1. Did the court err in refusing defendant's motion to quash the indictment for misjoinder of counts?

2. Did the court err in refusing to sustain defendant's demurrer at the close of the Commonwealth's case?

3. Did the court err in refusing defendant's motion to quash the indictment, because the indictment designates both the Court of Oyer and Terminer and the Court of Quarter Sessions of the Peace as the court in which the indictment was found?

4. Did the court err in refusing defendant's motion to quash the indictment, because it did not charge defendant with a crime cognizable under the laws of the Commonwealth of Pennsylvania?

5. Did the court err in admitting into evidence the statement of the defendant made while she was in custody?

6. Did the court err in its instructions to the jury?

## *Misjoinder*

The bill of indictment returned by the September Grand Jury charges defendant with three crimes. Count 1 charges that defendant on or about the 15th day of March, 1963, committed a misdemeanor by indecently disposing of the body of a child, the Commonwealth contending that this is a misdemeanor under the common law of this Commonwealth. In count 2, defendant is charged with having, at or about the 17th day of April, 1962, indecently disposed of the body of another dead child born to her on that date. In count 3, defendant is charged with having, on or about the 13th day of March, 1963, committed adultery with one Roy Schaeffer, she being a married woman.

It is the law of this Commonwealth that separate, distinct, and unconnected misdemeanor offenses may

be charged in one indictment. However, each offense must be charged in separate counts: Commonwealth v. Sutton, 171 Pa. Superior Ct. 105; Commonwealth v. Morgan, 174 Pa. Superior Ct. 586. It is senseless and costly to require separate bills of indictment for each misdemeanor of the same grade when the court has the right, and, indeed, the duty in the interests of prompt and efficient administration of criminal justice to consolidate indictments for trial against the same defendant or against multiple defendants. The only limitation upon this authority is that no injustice, prejudice, or unfair advantage is taken of a defendant by the consolidation. Here we have one defendant and one indictment charging three separate, distinct, and unconnected misdemeanors. This cannot be prejudicial to defendant: Act of March 31, 1860, P. L. 427, sec. 40, 19 PS §785; Commonwealth v. Novak, 165 Pa. Superior Ct. 576. Therefore, we conclude that the court did not err in refusing the defendant's motion to quash the indictment for misjoinder of counts.

### Demurrer

At the close of the Commonwealth's evidence, defendant demurred both to the indictment and to the evidence. After hearing arguments of counsel, we overruled the demurrer. Thereafter, we directed that defendant proceed under the provisions of the Act of June 5, 1937, P. L. 1703, sec. 1, 19 PS §481. However, defendant immediately rested her case, and she neither offered evidence nor testified herself. For reasons and authority hereinafter discussed under other headings, we are of the opinion that the court did not err in refusing to sustain the demurrers.

### Error Designating Court

At the outset of the trial, defendant moved us to quash the indictment, assigning as reason therefor that the indictment appears on its face to have been

brought in both the Court of Oyer and Terminer and Quarter Sessions of the Peace for the County of Lebanon, Pa. After considering the arguments and briefs of the parties, we refused the motions and directed the Commonwealth to delete the heading, "In the Court of Oyer and Terminer."

The Constitution of the Commonwealth of Pennsylvania is archaic and in dire need of revision. For various reasons, most of which defy rational explanation, political attempts to amend or rewrite the constitution have failed. One such relic of the past, still part of our constitution, is the division of criminal jurisdiction between two criminal courts. The only actual distinction between the courts is their jurisdiction. In most counties, one common pleas judge presides not only in common pleas court but also in both criminal courts.

The court of oyer and terminer and general jail delivery is a constitutional court existing in each county, meeting quarterly, presided over by a judge or judges of the courts of common pleas, *with general criminal jurisdiction*, exclusive as to certain crimes, and, as to others, concurrent with the court of quarter sessions of the peace. All crimes and misdemeanors, except such of which the quarter sessions court may be given exclusive jurisdiction by statute, are triable in the oyer and terminer court, though the quarter sessions court has concurrent jurisdiction except, of course, where exclusive jurisdiction is given to the oyer and terminer courts as in cases of manslaughter, treason, sodomy, burglary, rape, robbery, and others. The misdemeanors charged in this bill of indictment are not exclusively triable in the court of oyer and terminer, although the courts would have jurisdiction under its general powers: Act of March 31, 1860, P. L. 427, sec. 31, 17 PS §391.

The other court having jurisdiction in criminal cases is designated the court of quarter sessions of the peace. This court, commonly called quarter sessions, is a constitutional court and a court of record. This court is presided over by judges of the court of common pleas. It, too, is held four times a year, but special sessions may be held or adjourned. It, also, has *general jurisdiction in criminal matters*, except where exclusive jurisdiction is given to the court of oyer and terminer: Act of March 31, 1860, P. L. 427, sec. 32, 17 PS §361. Neither adultery nor the common law offenses charged in this indictment are exclusively triable in quarter sessions court, and, therefore, it would have concurrent jurisdiction. It is difficult to perceive, then, how this defendant could possibly be prejudiced or deprived of any rights, because the bill of indictment contains a designation of both courts. For all practical matters, there is the appearance of but one criminal court in Lebanon County, which is held in the same courtroom and presided over by the same judge, and it is difficult to determine at what point the judge is sitting in quarter sessions, oyer and terminer, common pleas or orphans' court. This objection is technical and curable by amendment. The indictment was amended in accordance with the court's instructions prior to the case being called for trial. Thus, we are of the opinion that the trial court did not err in refusing the defendant's motion to quash the indictment. See Act of March 31, 1860, P. L. 427, sec. 11, 19 PS §431, Commonwealth v. Shaffner, 2 Pearson 450.

### Common Law Crimes in Pennsylvania

Defendant does not contend, nor does she argue, that the evidence is insufficient to convict her of adultery. She does, however, argue, at least in support of her demurrer to the indictment and motion to quash the indictment, that the indictment does not charge de-

fendant with a crime under the laws of this Commonwealth. However, at oral argument and in the brief submitted to us by defendant, there is a tacit admission that it would be a crime at common law to indecently dispose of a dead body.

We consider the matter of common law crimes both gravely and carefully. We have considered authorities on the subject, both under the laws of the Commonwealth of Pennsylvania and in other common law jurisdictions. We conclude that this bill of indictment does properly charge the defendant in two separate and distinct counts with committing an offense cognizable under the common law.

There is no statute in this Commonwealth which would make the acts chargeable to the defendant a misdemeanor. However, the Criminal Code of June 24, 1939, P. L. 872, sec. 1101, 18 PS §5101, provides as follows:

"Every offense now punishable either by the statute or common law of this Commonwealth and not specifically provided for by this act, shall continue to be an offense punishable as heretofore."

This statute was merely a reenactment of prior statutes which have preserved common law crimes and made them part of our jurisprudence. We are a community, indeed a nation, with but one exception,[2] that has embraced the concepts and principles of the common law. The essential characteristic of the common law, which distinguishes it as a system of law from the civil law, is its flexibility. Under the common law, we are not powerless to cope with novel situations not comprehended or contemplated by the legislators. In his work on the common law, Justice Holmes noted that, "The first requirement of a sound body of law

[2] Louisiana, with its historic ties to France has adopted the civil law or code system, patterned in part after the Napoleonic Code. Its rigidity has been frequently criticized by legal writers.

is that it should correspond with the actual feelings and demands of the community, whether right or wrong." The landmark case in this Commonwealth which enounces the principle of preserving common law offenses is Commonwealth v. McHale, 97 Pa. 397. After analyzing and determining that common law crimes are preserved, Mr. Justice Paxton, at page 408, asks the question, "What is a common-law offense?"

"The highest authority upon this point is Blackstone. In chap. 13, of vol. 4, of Sharswood's edition, it is thus defined: 'The last species of offenses which especially affect the Commonwealth are those against the public police or economy. By the public police and economy I mean the due regulation and domestic order of the kingdom, whereby the individuals of the state, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood and good manners, and to be decent, industrious and inoffensive in their respective stations. This head of offenses must therefore be very miscellaneous, as it comprises all such crimes as especially affect public society, and are not comprehended under any of the four preceding series. These amount some of them to felony, and other to misdemeanors only.' "

Thus, from the McHale case in 1881 down to the present time, our courts have consistently recognized common law offenses under the doctrine set forth in the McHale case. This is so even in the absence of specific common law precedent or statutory declaration. The McHale doctrine has been held to be applicable to any conduct which is inherently offensive to the public peace, decency, morals, and economy: Commonwealth v. Evans, 190 Pa. Superior Ct. 179; Commonwealth v. Cano, 182 Superior 524, affirmed by the Supreme Court in 389 Pa. 639. For a list of recognized common law offenses in this State, see 1 Kessler on Criminal Procedure 173, et seq. It is true that

there is no precedent in this Commonwealth that is on all fours with the facts in this case. Indeed, there is no case at all dealing with the indecent or immoral disposition of a dead body. This does not surprise us. Perhaps for the same reason that the legislators have not passed a criminal statute proscribing such conduct, we have been able to find few factual authorities. It is undeniably the sentiment of people throughout the world that it would be unthinkable to ill treat a dead body. However, our research into the matter has disclosed two factually similar cases, one occurring in the State of Maine and another in the State of Arkansas.

The Maine case is reported in State v. Bradbury, 136 Me. 347, 9 A 2d 657 (1939). Frank E. Bradbury lived with his unmarried sister Harriet. They were old people. Harriet was in bad health and suffered injuries in a fall on June 9th, resulting in her death at 4 a.m. on June 10th at her home. Shortly thereafter, Frank went into the cellar and built a hot fire in the cellar furnace. He tied a rope around his sister's dead body and dragged it down the cellar steps and shoved it into the furnace and burned it. Being impossible to get it all in at one time, he waited for the head and shoulders to be first consumed and then he forced the remaining body further and further into the furnace until he at last got the door shut. Neighbors complained of disagreeable odors emanating from the Bradbury home, and an investigation resulted in the discovery of this grisly deed. Defendant was indicted and convicted of the common law offense of indecently disposing of a dead body. The Maine court in appellate review carefully considered the proposition: Wharton on Criminal Law, Vol. 2, §1704, wherein it is said, "Indecency in treatment of a dead human body is an offense at common law, as an insult to public decency. Hence, it is indictable to expose such a body without

proper burial; to wantonly or illegally disturb it . . ." In examining section 1704, Wharton also continues as follows, "A person, also, is indictable who buries or otherwise disposes of any dead body on which an inquest ought to be taken, without giving notice to a coroner, or, who, being under a legal duty to do so, fails to give notice to the coroner that a body on which an inquest ought to be held is lying unburied, before such body has putrified." Footnote 20 of section 1704 contains a number of English and American cases holding it to be an offense at common law even to bury a body in such a way as to obstruct the coroner in his duties. Thus, it is an offense at common law to obstruct or pervert public justice.

The other case examined by us was Baker v. State, 223 S. W. 2d 809 (Ark.) (1949). Ed White was an aged and old man drawing old age assistance from the State of Arkansas. His check for $30 came on the first day of the month. Defendant Mrs. Baker provided Ed with room, board, and personal attention, and, in turn, Ed would endorse the check to her by making a mark, he being illiterate. Ed lived in a cabin on defendant's premises and a short distance from her home. Ed's December 1st check was received and cashed by defendant on December 2nd, bearing Ed's purported mark. At 9 p.m., on December 2nd, defendant reported Ed's death to a funeral home. Experts who later examined Ed's body testified that he was dead at least five days. Decomposition and other ghastly conditions of the body had occurred. Defendant and her witnesses had testified that they saw Ed alive as late as 3 in the afternoon of December 2nd. Mrs. Baker was indicted and convicted of the common law offense characterized as "treating a dead body indecently." The court in its consideration of the case not only determined that defendant violated a duty to promptly report Ed's death but also considered the

indecent aspects of so using his dead body to get a $30 public assistance check.

Ever since the existence of man has been evidenced there is also evidence that there existed a standard of decency and respect for the dead and their resting places. The Holy Scripture discloses that it was a disgrace not to bury the dead: Jeremiah 16:4. See also Genesis 50:1-7. Archaeologists have unearthed graves of prehistoric men indicating that they had a religious, or at least respectful, concern for dead bodies and the way and manner in which they were treated and buried. The renowned pyramids of Egypt are but resting places for the dead and memorials to them. Resort to American Indian lore will reveal a whole body of custom dealing with the Indian's attitude and concept of decency with respect to dead bodies and places of burial. Much of the Indian's day's activities were performed with a view to earning a sacred and hallowed resting place upon their death. The Code of Justinian provided that, ". . . Directly the body or bones of a dead person, whether slave or free, were buried, the grounds in which they were buried became religious. . . ." Carved on the tomb of William Shakespeare is a reflection upon early English people's attitude toward the sanctity of the grave. It says, "Curst be he that moves my bones." In the English case of Regina v. Stewart, 12 A. & E. 773, p. 778, it is declared, "We have no doubt, therefore, that the common law casts on someone the duty of carrying to the grave, decently covered, the dead body of any person dying in such a state of indigence as to leave no funds for that purpose. The feelings and interests of the living require this and create the duty." So universal is the right of sepulture that the common law, as it seems, casts the duty of providing it, and of carrying to the grave the dead body, decently covered, upon the person under whose roof the death takes place; for such person can-

not keep the body unburied nor do anything which prevents Christian burial; he cannot, therefore, cast it out so as to expose the body to violation, or to offend the feeling or injure the health of the living, and for the same reason, he cannot carry the dead body uncovered to the grave: Wynkoop v. Wynkoop, 42 Pa. 293; Commonwealth ex rel. v. Susquehanna Coal Co., 6 Lanc. 107.

It would seem unnecessary for a further extension of this opinion to rationalize the existence in this community of a well-established and known standard of decency and morality with respect to the disposition and treatment of dead bodies. Yet, the importance of this matter commands one further observation. From our childhood, we have all been accustomed to pay a reverential respect to the sepulchres of our fathers and to attach a character of sacredness to the grounds dedicated and enclosed as the cemeteries of the dead. This standard of decency has been recognized by our legislators through the years, and they have made statutory provisions governing cemeteries, cemetery companies, reinterment and abandonment, crypts, burial permits, cremation, mutilation of graves and tombstones, mausoleums and vaults. At both common law and under the statutory law of this Commonwealth, it is an offense to dig up or disturb or desecrate bodies which have been buried. It is an outrage upon the public feelings and torturing to the afflicted relations of the deceased. If it be a crime thus to disturb the ashes of the dead, it must also be a crime to deprive them of a decent burial, by disgracefully exposing or disposing of the body, contrary to usages so long sanctioned by people and which are so grateful to the wounded hearts of friends and mourners, and this is so, irrespective of their religious aspects of burial and life hereafter, be it Christian, Jew, or Agnostic. We thus consider the common law as being sufficiently broad to punish as a

misdemeanor, although there may be no exact precedent, any act which directly injuries or tends to injure the public to such an extent as to require the state to interfere and punish the wrongdoer, as in the case of acts which injuriously affect public morality or obstruct or pervert public justice, or the administration of government: Commonwealth v. Mochan, 177 Pa. Superior Ct. 454. It is the common law of this Commonwealth that whatever openly outrages decency and is injurious to public morals is a misdemeanor and punishable at law.

We have little difficulty therefore in concluding that this bill of indictment does properly charge the defendant with a crime cognizable under the laws of the Commonwealth, and the court did not err in refusing the defendant's motion to quash the indictment assigning therefor this reason.

### Confession

Defendant argues that the trial court erred in admitting into evidence the written statement of the accused taken while she was in custody as the result of an illegal arrest. It is the established law in this jurisdiction that a confession is not rendered involuntary, merely because, at the time it was given, the accused was under arrest or in confinement, even if the arrest or confinement is illegal: Commonwealth v. Turner, 371 Pa. 417; Commonwealth v. Agoston, 364 Pa. 464; Commonwealth v. James, 294 Pa. 156; Commonwealth v. Spardute, 278 Pa. 37. Defendant's brief acknowledges this to be the law but submits that it should not be. Defendant's wish may soon be law by edict of the United States Supreme Court. Cf. Escobedo v. Illinois, 378 U. S. 478, decided June 22, 1964.

The trial court's ruling was not error under our law.

### Instructions to the Jury

Defendant did not assign error in the court's charge as a reason in support either of its motions for a new

trial or in arrest of judgment. However, at the conclusion of the court's instructions to the jury, defendant did request that we further define for the jury the term, "indecent disposition." Defendant also specifically excepted to that portion of our charge referring to the moral standards to be applied in this case. We used the expression, ". . . this community . . . ," and a little later, ". . . this Commonwealth . . . ." It should be remembered that we are not here dealing with a moral concept about which our people widely differ, be they local, State, or national. A decent and reverential treatment of dead bodies is commanded by precepts taught to us by our forefathers. It is not necessary to further define terms commonly used in the English language. The expression, "disposition," is not an unusual, strange or difficult word, and the trial court certainly had the right to rely upon the intelligence of the jury in understanding what is meant by a common verb. So, also, was further refinement or definition of the terms "decent" and "moral" unnecessary, because we did instruct the jury that they must consider the moral standard of the community. The Superior Court has recently cited with approval Mr. Justice Cardozo, Paradoxes of Legal Science, as follows. " 'Sound morals as taught by the wise men of antiquity, as confirmed by the precepts of the gospel . . . are unchangeable. They are the same yesterday and today.' We see no reason to retreat from those ideas. 'We are a religious people whose institutions presuppose a Supreme Being.' Zorach v. Clauson, 343 U. S. 306, 313, 72 S. Ct. 679, 684, 96 L. Ed. 954. Our Federal and State Constitutions assume that the moral code which is part of God's order in this world, exists as the substance of society. The people of this State have acted through their legislature on that assumption. We have not so cast ourselves adrift from that code nor are we so far gone in cynicism that the word 'immoral' has no meaning for us. Our

duty, as a court, is to uphold and enforce the laws, not seek reasons for destroying them.": Commonwealth v. Randall, 183 Pa. Superior Ct. 603, 611.

We have reviewed our charge as a whole and conclude that the jury was adequately and correctly instructed as to the applicable principles of the common law crimes charged in the bill of indictment and that no basic or fundamental error therein was committed by the court.

### Sufficiency of the Evidence

We have heretofore referred to our consideration of this matter as one of prime importance to our jurisprudence. In pursuance of this attitude, we have very carefully reviewed the evidence for sufficiency. Perhaps it would be helpful to state here our strong feeling that the extension of common law crimes and doctrines should be carefully and cautiously limited. Like many abstract legal theories, the coin has two sides. On one, we find the thought that legal legislation in criminal law by the courts is to be avoided, because it is not fair to convict a person for a crime previously unrecognized by either case law or statute. Mr. Justice Woodside dissenting in Commonwealth v. Mochan, supra, expressed his concern in the following language:

"The majority is declaring something to be a crime which was never before known to be a crime in this Commonwealth. They have done this by the application of such general principles as, 'It is a crime to do anything which injures or tends to injure the public to such an extent as to require the state to interfere and punish the wrongdoer;' and, 'whatever openly outrages decency and is injurious to public morals is a misdemeanor.' . . . But after nearly 200 years of constitutional government in which the legislature and not the courts have been charged by the people with the responsibility of deciding which acts do and which do

not injure the public to the extent which requires punishment, it seems to me we are making an unwarranted invasion of the legislative field when we arrogate that responsibility to ourselves by declaring now, for the first time, that certain acts are a crime."

Akin to this contention is the well seated constitutional concept of the separation of powers. Truly, in this field, we should tread lightly, carefully, and cautiously.

On the other side of the coin, of course, is a strong and valid argument. We recognize that it is impossible for legislators to conceive of every possible crime and provide a proper penalty. It would be a reproach upon the common law and a denial of Mr. Justice Holmes' observations or requirements for a sound body of law, if acts which outrage decency and public morals were held not to be indictable. In setting up and declaring common law crimes, the courts are not seeking to entrap innocent persons but to prohibit acts detrimental to public good, and though it is a doctrine of widespread scope, it is in pursuit of a proper purpose and result.

Between the poles of the foregoing contentions, of course, is a vast and dangerous area. We do not feel that the instant case is an unwarranted extension of common law doctrines, inasmuch as the standards of decency and morality with respect to the dead and the dead bodies is so well known and so universally understood and observed. In the instant case, there was ample evidence to support a finding of fact by the jury which would offend the community's standard of decency and morality. The dispositions of these infant children by the defendant could well be found to be indecent and outrageous to public feelings in that they were deprived of a decent and proper burial, irrespective of the additional indecent motive for so depriving them. It is hardly compatible with good public health

to allow dead bodies to be placed in bathrooms, closets, or cellars. It might well be considered an offense against public morality to conceal the fact that a married woman had given birth to children under circumstances wherein she was separated from her husband who is in the military service, and she was living with a man not her husband. The placing of the dead body of the child wrapped in bloodstained rags and stuffed in a box and put on a shelf in the cellar for these reasons clearly offends public decency and morality. So, too, the wrappings of the second child's body in bloodstained rags and stuffing it in a sanitary napkin box and putting it in the bathroom closet there to remain without disclosing this fact to the proper persons or authorities for nearly eight days is also outrageous to public feeling. In failing to report the birth and death or the dead birth, whichever the case may be, might well be found to be an indecent and immoral perversion and obstruction of public justice. The passage of time and the circumstances surrounding the manner of placing these dead bodies has prevented pathological experts from determining whether or not these children were born dead or alive. This conduct of itself would be an offense at common law under the authorities cited hereinbefore so as to require the intervention of the State to invoke a proper punishment so as to discourage such conduct in the future among the citizens of a well-organized society.

In summary, upon review of the testimony, the evidence, and the charge of the court, we find that there is ample evidence to support the guilty verdict returned by the jury in this case. Therefore, we will refuse defendant's motion in arrest of judgment and motion for a new trial.

### Order of Court

And now, to wit, August 19, 1964, defendant's motion in arrest of judgment and motion for a new

trial are refused. Defendant is hereby directed to appear before us on Friday, September 11, 1964, at 10 a.m. in courtroom no. 1 for sentencing.