J-A10038-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA

Appellee

v.

ROBERT L. BURGESS

Appellant

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 700 WDA 2015

Appeal from the Judgment of Sentence November 25, 2014
In the Court of Common Pleas of Beaver County
Criminal Division at No(s): CP-04-CR-0002178-2012

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and PANELLA, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED AUGUST 30, 2016**

Appellant, Robert L. Burgess, appeals from the judgment of sentence entered in the Beaver County Court of Common Pleas, following his jury trial convictions for one count each of burglary, criminal trespass, possession with intent to deliver a controlled substance ("PWID"), possession of a controlled substance (marijuana), conspiracy to commit PWID, and firearms not to be carried without a license; two counts each of first-degree murder, simple assault, and recklessly endangering another person; four counts each of kidnapping, false imprisonment, and unlawful restraint; and his bench trial conviction for persons not to possess firearms.[1]  We affirm.

─────────────────────────────

[1] 18 Pa.C.S.A. §§ 3502, 3503; 35 P.S. §§ 780-113(a)(30), (a)(16); 18 Pa.C.S.A. §§ 903, 6106, 2502(a), 2701, 2705, 2901, 2903, 2902, 6105.

The trial court opinion sets forth the relevant facts and procedural history of this case.[2] Therefore, we will only briefly summarize the facts and procedural history most relevant to this appeal. In June 2008, Demetria Harper ("Mrs. Harper") advised Appellant and his cohort, Devon Shealey ("Mr. Shealey"), that she could obtain marijuana for an attractive price in El Paso, Texas, and arranged to buy marijuana with Appellant and Mr. Shealey's money. After purchasing the marijuana, Mrs. Harper falsely informed Appellant and Mr. Shealey that the police had stopped her vehicle and confiscated the drugs. Mrs. Harper actually mailed the drugs to her Pennsylvania residence. Appellant and Mr. Shealey doubted Mrs. Harper's story. On June 29, 2008, Mrs. Harper returned to her home in Pennsylvania. The next day, Appellant and Mr. Shealey learned a package had been delivered to the Harper residence. Based on their belief that the package contained drugs Mrs. Harper had purchased in Texas, Appellant and Mr. Shealey traveled to Mrs. Harper's residence and demanded return of the money they had supplied or the marijuana. Appellant and Mr. Shealey confronted Mrs. Harper and Richard Harper ("Mr. Harper") at gunpoint in their bedroom with their two minor daughters present. Appellant and Mr. Shealey forced Mr. and Mrs. Harper to the basement at gunpoint and "hog-

_____

[2] The court's recitation of the facts appears in its analysis of Appellant's challenge to the sufficiency of the evidence (which Appellant does not raise on appeal). (**See** Trial Court Opinion, filed June 23, 2015, at 6-14.)

tied" them by the hands and feet. Appellant and Mr. Shealey then forced the children to the basement and locked them in the furnace room. Mr. Shealey fatally shot Mr. Harper in the head; Appellant fatally shot Mrs. Harper in the head.

During investigation of the case, Detective Timmie Patrick ("Detective Patrick") of the Beaver County District Attorney's Office Detective Bureau interviewed Tyrone Beasley, Jr. ("Mr. Beasley"), Antoinette Smothers ("Ms. Smothers") (Appellant's fiancée), and Shavon Hampton ("Ms. Hampton") (Appellant's girlfriend and the mother of Appellant's child). From the witnesses' statements and telephone records, Detective Patrick discovered these witnesses knew of Appellant's involvement in the drug transaction and homicides. Detective Patrick employed what he deemed "standard tactics" for gathering information to learn how much knowledge the witnesses had to offer about the case.

Police also received facts about the case from Isaiah Paillet ("Mr. Paillet"). Mr. Paillet told police that while he was incarcerated on the same cellblock as Appellant, Appellant had disclosed specific details of his participation with Mr. Shealey in the murders of Mr. and Mrs. Harper. According to Mr. Paillet, Appellant said Mr. Shealey shot Mr. Harper, and Appellant shot Mrs. Harper.

Appellant proceeded to jury selection in October 2014. During jury selection, three law enforcement officers, Detective Patrick, Detective

Sergeant Michael Kryder, and Special Agent Maurice Ferentino, were present alongside the Commonwealth's two prosecutors who were trying the case. Prior to trial, defense counsel requested sequestration of all but one of the law enforcement officers, claiming Pa.R.E. 615[3] prohibited three law enforcement officers from sitting at the prosecution's table during trial. The court denied defense counsel's motion to sequester.

On October 28, 2014, a jury convicted Appellant of two counts of first-degree murder and numerous other offenses in connection with Appellant's and Mr. Shealey's murder of Mr. and Mrs. Harper. The court also convicted Appellant of persons not to possess firearms. The trial court sentenced Appellant on November 25, 2014, to two consecutive life sentences for the first-degree murder convictions and an aggregate consecutive term of twenty-seven (27) to fifty-four (54) years' imprisonment for the other offenses. On December 1, 2014, Appellant timely filed post-sentence motions, which the court denied on March 31, 2015. On April 27, 2015, Appellant timely filed a notice of appeal. The court ordered Appellant on April 30, 2015, to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant timely filed his Rule 1925(b)

---

[3] **See** Pa.R.E. 615(b) (stating: "At a party's request the court may order witnesses sequestered so that they cannot learn of other witnesses' testimony. Or the court may do so on its own. But this rule does not authorize sequestering: …(b) an officer or employee of a party that is not a natural person (including the Commonwealth) after being designated as the party's representative by its attorney").

statement on May 13, 2015.

Appellant raises three issues for our review:

> WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND/OR ERRED IN FAILING TO INSTRUCT THE JURY AS TO DURESS?
>
> WHETHER THE TRIAL COURT ERRED [OR] ABUSED ITS DISCRETION WHEN IT PERMITTED THREE (3) LAW ENFORCEMENT OFFICERS TO BE PRESENT AT THE COMMONWEALTH TABLE DURING THE ENTIRE TRIAL WHICH VIOLATED RULE 615 OF THE PENNSYLVANIA RULES OF EVIDENCE?
>
> WHETHER ALL OF THE CHARGES SHOULD BE DISMISSED DUE TO A VIOLATION OF DUE PROCESS WHEN DETECTIVE TIMMIE PATRICK CAJOLED AND/OR THREATENED WITNESSES WHICH WAS OUTRAGEOUS CONDUCT?

(Appellant's Brief at 9).

"Our standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when [the court] abused its discretion or committed an error of law." *Commonwealth v. Janda*, 14 A.3d 147, 163 (Pa.Super. 2011).

Additionally:

> This Court's standard of review for a trial court's decision on sequestration of witnesses is [an] abuse of discretion. We will not reverse a trial judge's decision to grant or deny sequestration absent a clear abuse of discretion. Moreover, an appellant must demonstrate that he…was actually prejudiced by a trial judge's sequestration order before any relief may be warranted. … A request for sequestration must be specific and supported by a showing that the interests of justice require it. The purpose of sequestration is to prevent a witness from molding his testimony with that presented by other witnesses.

*Commonwealth v. Stevenson*, 894 A.2d 759, 767 (Pa.Super. 2006), *appeal denied*, 591 Pa. 691, 917 A.2d 846 (2007) (internal citations omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable John Dohanich, we conclude Appellant's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion at 40-50, 18-29) (finding: **(1)** Mr. Paillett's trial testimony, read in its entirety, does not support Appellant's claim that Mr. Shealey threatened Appellant or forced him to kill Mrs. Harper; evidence showed Appellant was leader in underlying drug transaction; upon learning of Mrs. Harper's return from Texas and that package had been delivered to her home, Appellant immediately left Baltimore and showed up at Mrs. Harper's residence with Mr. Shealey because "they [were] f'ing up [his] money"; Mr. Paillett confirmed Mrs. Harper was "Appellant's problem"; no evidence of record suggests Appellant feared Mr. Shealey or that Mr. Shealey threatened Appellant or coerced him to shoot Mrs. Harper; evidence did not warrant jury instruction on duress; **(2)** Rule 615 does not on its face prohibit Commonwealth from having more than one law enforcement officer at prosecutor's table as Commonwealth's representative; Appellant's averment that testimony of three officers who sat at prosecutor's table supported and overlapped one another lacks

specificity and fails to show that interests of justice required sequestration; Appellant does not indicate how any officer's testimony was molded by testimony of other officers; absent proof of specific evidence to justify sequestration or demonstration of actual prejudice, Appellant's claim fails; as well, three government agencies jointly cooperated in investigation leading to charges against Appellant, and officers from these agencies who sat at prosecutor's table were co-affiants on charging documents; further, testimony from these officers was not so critical to Commonwealth's case, in light of evidence from other witnesses, to justify sequestration; facts of cases on which Appellant relies are distinguishable; **(3)** Appellant's complaint that Detective Patrick's interactions with three witnesses constituted outrageous government misconduct in violation of Appellant's due process rights is waived for failure to raise that claim pre-trial or during trial; moreover, regarding Mr. Beasley, record shows Mr. Beasley voluntarily consented to meet police at headquarters for interview; Mr. Beasley did not inform police that he suffers from Type I Diabetes, and he exhibited no signs of distress or confusion during interview; Mr. Beasley was coherent, he corrected officers regarding some details of investigation, and Mr. Beasley confirmed he was not bullied by police; after interview, Mr. Beasley's significant other drove him to hospital because she was concerned Mr. Beasley had not taken his Diabetes medication while he was at police station; record does not support Appellant's allegation that police threatened

Mr. Beasley or that his hospital visit was result of police conduct during interview; regarding Ms. Smothers, Detective Patrick played recording for Ms. Smothers of Appellant talking to his other girlfriend; after hearing Appellant's voice on tape, Ms. Smothers agreed to assist with investigation; Detective Patrick also played recording of Appellant and Ms. Smothers, so she would know police had their communications on tape; Detective Patrick showed Ms. Smothers photograph of crime scene, so she would understand serious nature of investigation; Ms. Smothers did not indicate she was threatened or coerced to give statement to police; regarding Ms. Hampton, Detective Patrick also played recordings for Ms. Hampton of conversations between Appellant and Ms. Hampton, and between Appellant and Ms. Smothers; Detective Patrick also showed Ms. Hampton photograph of crime scene to gain her assistance; record is devoid of any threats, false representations, deception or trickery used by Detective Patrick in interviewing these witnesses; Detective Patrick's interview tactics fall within normal course of criminal investigation and do not constitute outrageous government misconduct to establish due process violation). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/30/2016</u>

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY,
P E N N S Y L V A N I A
CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

    v.

ROBERT L. BURGESS

:
:
:    No. 2178 of 2012
:
:
:
:

## MEMORANDUM OPINION

DOHANICH, S.J.                         June 23, 2015

The defendant, Robert L. Burgess, has appealed the judgment of sentences imposed following his convictions by a jury on October 28, 2014, of two counts of first degree murder, burglary, criminal trespass, four counts of kidnapping, four counts of false imprisonment, four counts of unlawful restraint, carrying a firearm without a license, two counts of simple assault, two counts of recklessly endangering another person, possession with intent to deliver marijuana, conspiracy to commit possession with intent to deliver marijuana and simple possession of marijuana. The jury acquitted the defendant of conspiracy to commit first degree murder, two counts of robbery and conspiracy to commit robbery. Upon the defendant's waiver of jury trial and request for a bench trial on the charge of person not to possess a firearm to be heard simultaneously with the jury

trial on the above charges, the court convicted the defendant of said firearms offense. The Commonwealth, prior to trial, without objection and with leave of court, withdrew eight counts of robbery.

At the time of arraignment on November 30, 2012, the Commonwealth, pursuant to the Sentencing Code, 42 Pa. C.S. §9711, filed its notice of intention to seek the death penalty citing six separate aggravating factors in the event of convictions of first degree murder. Following the death penalty phase, the jury was unable to reach a verdict as to the penalty.

The instant case is the companion case to Commonwealth v. Devon O. Shealey at No. 2177 of 2012, which is currently on appeal to the superior court at No. 186 WDA 2015.

The charges against the defendant resulted from the invasion of the home and shooting deaths of Richard Harper (Richard) and his wife, Demetria Harper (Demetria), in the presence of their two minor daughters, Laniya, age 10, and Iyana, age 8, committed by the defendant and co-defendant, Devon O. Shealey (Shealey), in the late evening hours of June 30, 2008, in the Harper residence located at 809 Second Avenue, Beaver Falls, Beaver County, Pennsylvania.

On November 25, 2014, the court sentenced the defendant to two consecutive terms of life imprisonment on the first degree murder convictions,

followed by consecutive sentences on two counts of kidnapping relating to the children of not less than ten years nor more than twenty years; person not to possess a firearm of not less than five years nor more than ten years; and possession with intent to deliver marijuana of not less than two years nor more than four years, for aggregate consecutive sentences of not less than 27 years nor more than 54 years. Sentences on the remaining charges were ordered to run concurrent or merged with corresponding offenses.

The defendant filed a timely post-sentence motion on December 1, 2014. Briefs were submitted by the defendant and the Commonwealth following which the court denied the defendant's post-sentence motion by order of March 31, 2015. Notice of appeal was filed by the defendant on April 27, 2015. The court directed the defendant to file and serve a concise statement of errors complained of on appeal on or before May 21, 2015. The defendant's timely concise statement filed on May 13, 2015, sets forth the following errors complained of on appeal:

> 1.    Whether there was insufficient evidence concerning the charges of first degree murder, simple assault, recklessly endangering another person, burglary, criminal trespass, firearms not to be carried without a license, kidnapping, false imprisonment, person not to possess a firearm and unlawful restraint, when the Commonwealth failed to prove that Appellant was the actual person that committed the crimes? *See* Brief in Support of Post-Sentencing Motions, Argument I.

> 2.    Whether there was insufficient evidence to prove the charges of recklessly endangering another person when the two (2) children of

3

the victims were behind a wall of approximately one (1) foot or more of stone and could not possibly be endangered of serious bodily injury when the guns were fired? *See* Brief in Support of Post-Sentencing Motions, Argument II.

3.      Whether the trial court erred and/or abused its discretion when it permitted three (3) law enforcement officers to be present at the Commonwealth table during the entire trial which violated Rule 615 of the Pennsylvania Rules of Evidence? *See* Brief in Support of Post-Sentencing Motions, Argument III.

4.      Whether all of the charges should be dismissed due to a violation of due process when Detective Timmie Patrick cajoled and/or threatened witnesses which was outrageous conduct? *See* Brief in Support of Post-Sentencing Motions, Argument IV.

5.      Whether the trial court erred and/or abused its discretion in failing to grant a mistrial when Agent Maurice Ferentino testified that the Appellant was a gang member and/or associated with a gang? *See* Brief in Support of Post-Sentencing Motions, Argument V.

6.      Whether trial court abused its discretion in failing to grant a mistrial when the Commonwealth presented testimony that the Defendant was on parole? *See* Brief in Support of Post-Sentencing Motions, Argument VI.

7.      Whether the trial court abused its discretion by allowing the Commonwealth to present inadmissible hearsay evidence? *See* Brief in Support of Post-Sentencing Motions, Argument VII.

8.      Whether the trial court erred in failing to instruct the jury as to duress? *See* Brief in Support of Post-Sentencing Motions, Argument VIII.

9.      Whether the trial court erred in refusing to allow written jury instructions as to the defenses? *See* Brief in Support of Post-Sentencing Motions, Argument IX.

This Opinion is filed pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, 42 Pa. C.S., to address the issues raised by the defendant in his concise statement.

## SUFFICIENCY OF EVIDENCE AS TO IDENTITY OF DEFENDANT AS PERPRETRATOR OF ALL OFFENSES

The defendant challenges the sufficiency of the Commonwealth's evidence proving that he was the perpetrator of the crimes for which he was convicted.

The test for a challenge to the sufficiency of the evidence was summarized in *Commonwealth v. Donahue, 428 Pa.Super. 259, 272, 630 A.2d 1238, 1244 (1993)*, as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the

5

prosecution the benefit of all reasonable inferences to be drawn from the evidence.

However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review.

When viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the following facts were established at trial: In the spring of 2008, Demetria and Margarette (Nay Nay) Moore (Moore) became acquainted through the activities of their respective children as residents in the same Second Avenue, Beaver Falls neighborhood, and over time, became close friends. The Harper family had relocated to Beaver Falls from El Paso, Texas. Moore had been familiar with the defendant, Burgess, since attending high school; lost touch with him through the years; and resumed their relationship in 2007. Burgess lived on Letsche Street in the North Side section of Pittsburgh. Moore introduced Demetria to Burgess when Demetria transported Moore to the Burgess residence in early June, 2008. On at least two additional occasions, Demetria drove Moore to the Burgess home within a week or two of the first visit, during which the co-defendant, Shealey, was also present. Demetria was introduced to Shealey, also known as "D", through Burgess, who was also known as "Raw". At

6

one of the meetings, Demetria advised Burgess and Shealey that she could obtain marijuana for an attractive price in El Paso, which prompted discussions among Demetria, Burgess, Shealey and Moore, and led to a plan by which Burgess and Shealey would front funds to Demetria for her to travel to El Paso, obtain marijuana, and mail it to an address provided by Burgess. To assure Demetria's participation in the plan, a copy of Demetria's identification card, which included her address, was made by Burgess on a copier at his residence. On June 25, 2008, Moore drove Demetria to the Burgess residence where Demetria purchased a round-trip airline ticket online utilizing the computer of Burgess by which Demetria would travel from Pittsburgh to El Paso and return to Pittsburgh. Moore then transported Demetria to her home in Beaver Falls where she packed a suitcase and was taken by Moore to the Pittsburgh International Airport. Upon arriving at the airport, Demetria and Moore met Burgess and another unidentified individual. Burgess provided Demetria with $1,500.00 in funds to purchase marijuana in Texas. Demetria departed thereafter and arrived in El Paso later that day. After several days of negotiations, Demetria, by way of arrangements made through LaDon Williams (Williams), a friend of Demetria in El Paso, she purchased four pounds of marijuana for $800.00. The marijuana had an odor of gasoline, and Demetria and Williams attempted to remove the odor by way of a process of

boiling vegetables in a pot while holding the marijuana above the steam that was generated. While in Texas from June 25, 2008, through June 29, 2008, Demetria remained in constant contact with Moore, who was in the presence of and staying at the residence of Burgess. Shealey was also present at the Burgess home during this time. Moore, at the direction and insistence of Burgess, sent numerous text messages to Demetria inquiring as to the progress of her efforts to obtain the marijuana. After acquiring the marijuana, Demetria falsely forwarded a text message to Moore that Demetria had been stopped by the police at a checkpoint, had been arrested and the marijuana confiscated, when in fact, she had the marijuana mailed to her home in Beaver Falls. According to Moore, Burgess doubted Demetria's truthfulness. Prior to Demetria returning to Pittsburgh, Burgess and Shealey drove to Baltimore, Maryland to visit Burgess' girlfriend, Antoinette Smothers (Smothers). Demetria returned home from Texas on June 29, 2008. Upon observing a package being delivered to the Harper residence on June 30, 2008, Moore telephoned Burgess while he was in Baltimore to report the delivery. Immediately thereafter, Burgess and Shealey departed Baltimore and returned to Pittsburgh in the early evening hours. Later that same night, Burgess and Shealey traveled to Beaver Falls, entered the Harper home wearing masks completely covering their faces, gloves and dark clothing, and confronted

8

Demetria and Richard at gun point in their second floor bedroom while the two children were present demanding the return of the money previously provided and/or the marijuana. Demetria advised that the marijuana was in a box in the bedroom to which Burgess replied that they had no interest in the box. Demetria and Richard were taken to the basement at gunpoint and hog-tied by the hands and feet from behind with an electrical cord from a vacuum sweeper. The children were then escorted from the second floor bedroom to the basement and placed in a furnace room a short distance away from their parents, whom they observed bound and face down on the basement floor. Shortly thereafter, Shealey shot Richard in the head and Burgess shot Demetria in the head. The children heard the two shots from their location in the furnace room and also their father groaning from his wound. Burgess and Shealey retrieved the box containing the marijuana and departed, returning to Pittsburgh. The children remained in the furnace room the entire night until approximately 11:00 a.m. on July 1, 2008, when their aunt, Joanne Vaughn (Vaughn), the sister of Richard, arrived at the house after spotting Richard's vehicle outside the residence at a time when he should have been at work. Richard and Demetria were deceased when discovered by Vaughn who called police. Within days of the killings, Cheryl Chambers (Chambers) and her daughter, Rachel Harden (Harden), a girlfriend of Shealey and mother of his child,

9

observed Shealey in the possession of marijuana with an odor of gasoline attempting to remove the moisture and gasoline odor of the marijuana using a hairdryer.

Tyrone Beasley, Jr., who is the first cousin of Burgess, testified on behalf of the Commonwealth indicating that he and Burgess were very close having known each other their entire lives; were residents of the same neighborhood; and saw each other on a daily basis during 2008. Burgess had provided a cellular telephone, for which he was the subscriber, to Beasley for his use. Burgess informed Beasley that he would be traveling to Baltimore to visit a female acquaintance at the end of June, 2008. Upon the defendant's return from Baltimore on June 30, 2008, he directed Beasley to exchange the cellular telephone that Beasley was using for the cellular telephone Burgess possessed, and instructed Beasley not to answer any calls he received on Burgess' cellular telephone unless he could identify the caller. When Beasley inquired as to the reason for swapping telephones, Burgess replied that "somebody got out on him on some money." In the early morning hours of July 1, 2008, Beasley and his wife, Dara, had an argument, and Beasley went to the home of Burgess to spend the night. Later that morning, Beasley inquired of Burgess as to whether he wanted to walk their dogs, and Burgess replied that "something just went down", and he was required to

10

obtain his vehicle in Beaver Falls. Beasley was employed at Community College of Allegheny County in the housekeeping department and worked the 11:00 P.M. through 7:30 A.M. shift, Tuesday through Saturday. While at work from 11:00 P.M., Tuesday, July 1, 2008, through 7:30 A.M., Wednesday, July 2, 2008, he learned of the double homicide in Beaver Falls while watching the news on television. After completing his shift, Beasley met Burgess, informed him of the news item, and inquired of Burgess whether Burgess obtaining his automobile in Beaver Falls had anything to do with the double homicide. Burgess put his head down to his chest and nodded in the affirmative. Burgess advised Beasley that a person had "got out on him over money and he had to get his". Burgess provided additional details of arriving at the Harper residence and admitted to participating in the shootings.

Testimony was elicited by the Commonwealth from Cheryl Chambers and her daughter, Rachel Harden, that in the summer of 2008 they had met Burgess through the co-defendant, Shealey, who fathered a child with Rachel Harden. Shealey was a daily visitor to the Harden residence along with Burgess. Chambers testified that she knew that Burgess had a girlfriend in Baltimore and had gone to visit her with Shealey at the end of June, 2008. In November, 2008, as a result of reviewing various telephone records, Detective Sergeant Michael Kryder of the

11

Beaver Falls Police Department called Harden's cellular telephone number which was subscribed to Chambers. Upon learning that Harden was a minor, Detective Sergeant Kryder requested that she have Chambers return his call. Upon contacting the Beaver Falls police, Chambers was advised that they wanted to speak with Harden and Chambers, and a meeting was scheduled for the Eat N' Park Restaurant in Bellevue, Allegheny County. Immediately after scheduling the meeting, Chambers contacted Burgess who met Chambers and Harden at their residence. Burgess informed them that he knew that the subject of the police inquiry was regarding a bad drug deal and instructed them to inform police that the reason that his telephone number appeared on their telephone records was because he was dating Chambers' older daughter, Rochelle. Burgess also informed them that he would have someone observing the meeting, and that if they did not follow his instructions that there would be consequences. Chambers and Harden met with Detective Kryder and Detective Timmie Patrick of the Beaver County District Attorney's Office Detective Bureau at the Eat N' Park as scheduled and were shown two photographs, one of which was of Burgess who they both identified. When Chambers inquired regarding the subject of the investigation, she was informed that a double homicide had occurred in Beaver Falls. At the conclusion of the meeting, Chambers and Harden departed, and on the way home, telephoned

12

Burgess who met them at their residence. Chambers informed Burgess that the police were investigating the double homicide in Beaver Falls and not a bad drug deal. During this period of time, the co-defendant, Shealey, was being held in the Allegheny County Jail on an unrelated homicide charge. Burgess expressed concern regarding Shealey "running his mouth" and directed Harden to inquire of Shealey as to whether the Beaver Falls police had contacted him. Chambers and Harden also indicated that Shealey had access to the cellular telephone in the possession of Harden. The telephone records disclosed contact between Demetria and Harden's telephone number. Both Chambers and Harden denied that they had ever been in contact with Demetria. Burgess also advised Chambers and Harden that he had an alibi for his whereabouts at the time of the double homicides. Harden further indicated that Burgess was overly concerned with the Beaver County situation.

Isaiah Paillett provided testimony on behalf of the Commonwealth that he had known the defendant since 1993 as friends from the North Side of Pittsburgh. He was aware that Burgess and Shealey knew each other, since he had introduced them during the summer of 2007. As a result of being indicted by the Federal authorities, Paillett, Shealey and Burgess were incarcerated in 2010 at the Northeastern Ohio Correctional Facility on the same cell block with free access to

13

one another from April 28, 2010 through May 12, 2010, at which time Burgess provided specific details of his participation together with Shealey in committing the murders of the Harpers. Burgess confirmed that Shealey shot Richard and that he shot Demetria.

As a basis for his assertion that the above evidence was insufficient to link the defendant to the homicides, Burgess submitted solely the following statement in the brief in support of his post-sentencing motion:

> The Commonwealth failed to prove beyond a reasonable doubt that the defendant committed all of the crimes to which he was charged even when the evidence is viewed in the light most favorable to the Commonwealth.

Burgess failed to delineate which evidence was insufficient or the reasons for the insufficiency of the evidence as to the identity of the defendant as the perpetrator. Furthermore, the defendant failed to set forth any authority for his position.

Upon careful review of all of the evidence presented in the case, the court finds that the Commonwealth established beyond a reasonable doubt that Burgess was the perpetrator of the crimes of which he was convicted.

## SUFFICIENCY OF EVIDENCE OF ELEMENTS FOR TWO COUNTS OF RECKLESSLY ENDANGERING ANOTHER PERSON

Burgess contests that the minor victims were placed in danger of death or serious bodily injury when Burgess and Shealey shot the adult victims in the

14

basement of the residence while the children were located in the furnace room of the basement, and therefore, the Commonwealth failed to establish the elements of the two counts of recklessly endangering another person.

As noted above, the episode initiated on the second floor of the Harper home. When the minor victims attempted to enter their parents' bedroom, they encountered Burgess (the taller individual) and Shealey, one of whom closed the door on the head of Iyana, who began to cry. Both minor victims were then forced into the bedroom, with Burgess grabbing Iyana and placing a gun to her head while telling her to shut up. After both parents were taken to the basement, Burgess returned to the second floor bedroom and escorted the minor victims at gunpoint to the basement and placed them in the furnace room adjacent to where their parents were lying on the floor face down and hog-tied from behind. Both minor victims described the location of their parents on the floor as being "right in front of the furnace room".

Detective Timothy Staub characterized the Harper home as an approximately 100 year-old, two-story structure. The basement of the residence was described as being relatively small with sandstone walls and exposed rough cut timber joists in the low ceiling. He detailed his extensive and unsuccessful efforts in attempting to find the bullet which had entered and exited Richard

15

Harper's head. Detective Sergeant Kryder recounted that the furnace room was a small square area that occupied approximately one-fourth of the total basement.

The court, in *Commonwealth v. Hopkins, 747 A.2d 910, 915-916 (2000)* summarized the requirements to prove the offense of recklessly endangering another person, as follows:

> A person commits the crime of recklessly endangering another person if he engages in conduct which places or may place another person in danger of death or serious bodily injury. 18 Pa.C.S.A. § 2705. Our law defines "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 2301; *Commonwealth v. Rochon*, 398 Pa.Super. 494, 581 A.2d 239, 243 (1990). To sustain a conviction under section 2705, the Commonwealth must prove that the defendant had an actual present ability to inflict harm and not merely the apparent ability to do so. *In re Maloney*, 431 Pa.Super, 321, 636 A.2d 671, 674 (1994). Danger, not merely the apprehension of danger, must be created. *Id.* The mens rea for recklessly endangering another person is "a conscious disregard of a known risk of death or great bodily harm to another person." *Commonwealth v. Peer,* 454 Pa.Super, 109, 684 A.2d 1077, 1080 (1996). Brandishing a loaded firearm during the commission of a crime provides a sufficient basis on which a factfinder may conclude that a defendant proceeded with conscious disregard for the safely of others, and that he had the present ability to inflict great bodily harm or death. *Id.* at 1080-1081.

The defendant asserts that the children were protected in the furnace room and thus not in danger of death or serious bodily injury. This argument fails for two reasons. Initially, the children were subjected by the defendant to a loaded

16

firearm pointed at or toward them in the second floor bedroom of their parents and again as they were taken to the basement. Secondly, in view of the fact that the bullet that killed Richard Harper was never found, a reasonable inference can be drawn that the bullets that killed the Harpers may have ricocheted from the floor or the walls of the basement and into the furnace room. In both instances, the defendant had actual present ability to inflict harm and created a danger sufficient to consciously disregard a known risk of death or serious bodily injury to the children.

The defendant cites *Commonwealth v. Hopkins, supra,* and *Commonwealth v. Peer, 454 Pa. Super. 109, 684 A.2d 1077 (1996)*, in an effort to distinguish the facts in those cases from those in the instant case. However, the defendant's distinctions fail. In both *Hopkins* and *Peer,* the court held that the brandishing of a loaded firearm during the commission of a crime provides sufficient basis on which a factfinder may conclude that a defendant proceeded with conscious disregard for the safety of others, and that he had the present ability to inflict great bodily harm or death. The *Peer* court upheld a conviction for recklessly endangering another person where the defendant possessed a gun at a party at which he consumed alcohol, brandished the gun during a melee, struggled over control of the gun, and threatened to kill two people. In *Hopkins*, the court held

17

that the evidence was sufficient to support convictions for recklessly endangering another person with respect to two victims, where the defendant was in visible possession of a gun, the gun was loaded, the defendant used the gun to pistol whip a victim while another victim was less than five feet away during the pistol whipping, and the defendant carried the gun as he took money from a victim. In neither of the cases was the weapon actually fired. In the present case, not only did Burgess place a weapon to the head of one of the minor victims and escort the minor victims at gunpoint to the basement, he participated in shooting and killing the adult victims while the children were in close proximity in the furnace room. Based upon the above facts, the court determines that the Commonwealth produced evidence sufficient to convict Burgess of the two counts of recklessly endangering another person as to the two minor children.

## ALLEGED VIOLATION OF RULE 615 OF THE PENNSYLVANIA RULES OF EVIDENCE

Burgess alleges a violation of Rule 615 of the Pennsylvania Rules of Evidence as an error and/or abuse of discretion on the part of the trial court in permitting the three co-affiants to remain present during the entire trial. Prior to the commencement of the trial, defense counsel argued that Rule 615 permitted only one affiant to remain in the courtroom during the trial and relied on the cases

18

of *Commonwealth v. Turner, 371 Pa. 417, 88 A.2d 915 (1952)* and *Commonwealth v. Fant, 480 Pa. 586, 391 A.2d 1040 (1978)*. The defendant's brief further cited the former comment to Rule 615 which stated "in a criminal case, the prosecution has a right to have the law enforcement agent primarily responsible for investigating the case at the counsel table to assist in presenting the case, even though the agent will be a witness."

Prior to the commencement of the trial, defense counsel requested sequestration of all but one affiant. The Commonwealth responded that Detective Sergeant Kryder of the Beaver Falls Police Department, Detective Patrick of the Beaver County District Attorney's Office Detective Bureau and Agent Maurice Ferentino, Senior Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives had all executed the affidavit in support of the criminal complaint as co-affiants. The assistant district attorney also advised the court that Agent Ferentino had been specifically sworn in as a special task force officer by the district attorney, providing him with state authority to execute the affidavit.

Rule 615 of the Pennsylvania Rules of Evidence, 42 Pa. C.S., governing sequestration of witnesses provides, in pertinent part, as follows:

> At a party's request the court may order witnesses sequestered so that they cannot learn of other witnesses' testimony. Or the court may do so on its own. But this rule does not authorize sequestering: (b) an officer or employee of a party that is not a natural person (including

19

the Commonwealth) after being designated as the party's representative by its attorney.

An appellant must demonstrate that he was actually prejudiced by a trial judge's sequestration order before any relief may be warranted. ***Commonwealth v. Stevenson, 894 A.2d 759, 767 (Pa. Super. 2006)*** (Citation omitted). A request for sequestration must be specific and supported by a showing that the interests of justice require it. ***Commonwealth v. Counterman, 553 Pa. 370, 399, 719 A.2d 284, 299 (1998)*** (Citation omitted). The purpose of sequestration is to prevent a witness from molding his testimony with that presented by other witnesses. ***Id.***

Burgess asserts that Rule 615 never envisioned that the Commonwealth would be permitted to allow for three law enforcement officers to sit at counsel table, however, his argument lacks any supporting authority. Rule 615, on its face, does not limit the Commonwealth to one law enforcement officer to remain as the only representative of the Commonwealth during trial. Furthermore, the defendant's averment that the testimony of the three officers supported and overlapped one another, thus resulting in prejudice, fails to establish the specificity required to support a showing that the interests of justice required sequestration. The defendant has failed to indicate how any of the officers' testimony was molded by the testimony of each of the other officers. Without proof of specific evidence

20

justifying sequestration or the demonstration of actual prejudice, the defendant's argument as to a violation of Rule 615 fails.

The defendant's reliance on *Commonwealth v. Turner, supra,* and *Commonwealth v. Fant, supra,* is of no benefit. The *Turner* court determined that in a murder prosecution, the refusal of the trial court to grant a request for sequestration of two detectives whose testimony, relating to an inculpatory statement made by the defendant in supposed secrecy to a fellow prisoner, had a critical bearing on the defendant's guilt or innocence, and whose credibility was consequently of paramount importance, was an abuse of discretion. In *Fant,* the defendant was convicted of two counts of third degree murder after never having been identified prior to trial and whose conviction was based almost entirely on eyewitness testimony. The denial of his request to sequester the prosecution's witnesses, who either placed the defendant at the scene of the killings or testified that they witnessed the defendant commit the shooting, was held to be an abuse of discretion denying the defendant due process. The factual situations in *Turner* and *Fant* are clearly distinguishable from those of the case at bar.

The record reveals that the case against Burgess initially was investigated by the Beaver Falls Police Department and the Beaver County District Attorney's Office Detective Bureau, was subsequently referred to the United States Attorney's

21

Office as a result of a Federal grand jury investigation, and then returned to the Beaver County District Attorney's Office for prosecution. Therefore, the three separate agencies were jointly cooperating in the investigation leading to the charges filed against the defendant and justified the three co-affiants remaining present during the entire trial. In addition, the testimony of the officers in the instant case was not so critical to the Commonwealth's case as in *Turner* and *Fant*, in light of the evidence from other witnesses produced by the Commonwealth to establish the defendant's guilt.

## ALLEGED DUE PROCESS VIOLATION DUE TO ALLEGED CAJOLING/THREATENING OF WITNESSES

The defendant asserts that Detective Patrick's interactions with three Commonwealth witnesses, Tyrone Beasley, Jr. (Beasley), Antionette Smothers (Smothers) and Shavon Hampton (Hampton), constituted outrageous government misconduct resulting in a violation of due process. Specifically, the defendant alleges that Detective Patrick cajoled and/or threatened these witnesses to testify favorably for the Commonwealth. In response, the Commonwealth initially argues that the failure of the defendant to raise the due process issue at the pre-trial stage or during trial results in a waiver of this claim.

22

A review of the entire record confirms the Commonwealth's position. Neither prior to nor during the trial did the defendant challenge Detective Patrick's conduct as a violation of due process. The defendant first made this claim in his post-sentence motion. Rule 720(B) of the Pennsylvania Rules of Criminal Procedure, 42 Pa. C.S., provides that only issues raised before or during trial are deemed preserved for appeal. Absent a contemporaneous objection, the issue is not properly preserved on appeal. *Commonwealth v. Melendez-Rodriguez, 856 A.2d 1278, 1287 (Pa. Super. 2004).* A criminal defendant cannot assert a claim in a post-sentence motion for a new trial that evidence was erroneously admitted during his trial if he had not lodged an objection during the trial when the evidence was admitted. *Commonwealth v. Kohan, 825 A.2d 702, 706 (Pa. Super. 2003).* Failure to object results in a waiver of the claim. *Id.* Although the *Kohan* decision was superseded by the 2005 amendments as to paragraphs (A) and (C) of Rule 720 regarding after discovered evidence, its ruling as to raising issues prior to or at trial in order to preserve them on appeal pursuant to paragraph (B) of the Rule remains applicable.

The defendant, having failed to raise the issue of Detective Patrick's conduct with the three witnesses prior to or at trial, this claim has not been preserved and is thus waived.

23

Assuming arguendo that waiver is inapplicable, the defendant's allegation of coercing the witnesses is not supported by the record and thus fails to meet the requirements for a violation of due process based upon outrageous government misconduct.

To establish a due process violation on the basis of outrageous government misconduct, the defendant must prove that such conduct was so grossly shocking and so outrageous as to violate the universal sense of justice. ***Commonwealth v. Benchino, 399 Pa. Super. 521, 526, 582 A.2d 1067, 1069 (1990).*** (Citations omitted). The conduct of the government in conducting criminal investigations will be found to violate due process only in the rarest and most outrageous circumstances. ***Id.*** (Citations omitted).

In regard to Commonwealth witness Beasley, the defendant claims that Beasley was threatened by Detective Patrick by kicking him under the table in the interview room resulting in Beasley being hospitalized for a significant time. Burgess also avers that Detective Patrick testified that Beasley was "a project" that needed to be talked to in rough fashion to get him to say what police wanted from him during a lengthy interview with only one pause in the questioning.

A review of the record reveals that Beasley testified that on August 4, 2008, approximately one month following the murders, at approximately 1:00 P.M.,

24

Detective Patrick, Detective Sergeant Kryder and Detective Robert Chamberlain proceeded to his residence as a result of viewing the telephone number of Beasley's wife on the defendant's telephone records. Beasley voluntarily consented to meet the officers at the Pittsburgh police headquarters on Western Avenue. Beasley drove himself to the police station where the officers met with him in an interview room and commenced questioning him regarding his knowledge of the defendant and the defendant's involvement in the Harper murders. Beasley remained with the officers at the police department until 5:43 P.M. at which time he provided a tape-recorded statement. During the course of the interview, the parties took a break when they ate snacks and consumed liquids. Beasley provided the officers with the name of his girlfriend, Annette Jackson, to corroborate that he and Beasley had exchanged telephones upon the defendant's return from Baltimore. Beasley indicated that he suffers from Type I Diabetes, however, he did not inform the police of his condition and exhibited no signs of distress or confusion. He remained coherent during the interview, corrected the officers regarding some details of information and confirmed that he was not bullied by the police. Upon conclusion of the interview, Beasley's wife, Dara, arrived at the police station concerned that Beasley had not taken his prescribed medication and drove him to the hospital where they arrived at 8:03 P.M. His

25

blood glucose level was slightly elevated, he was given medication and released from the hospital the next day. While in transport to the hospital, Dara advised that Beasley was not confused and that he informed her that he was kicked under the table by one of the officers in the interview room. Beasley did not mention to his wife that he was bullied by the officers. Beasley continued to remain in contact with Detective Patrick throughout their entire investigation to the time of trial and remained cooperative. Detective Patrick described Beasley's interview as "a process", because he was uncertain as to the information the officers were attempting to obtain and was told to slow down in order for the officers to get the details he was providing "bit by bit", as he had "a lot of information to give". Detective Patrick was unaware of Beasley's medical condition until much later in the investigation. Detective Patrick further related that Beasley remained coherent and even corrected officers on some of the information.

Smothers, who is the defendant's fiancé, resided in Baltimore, Maryland. In March, 2012, Detective Patrick and Detective Kim Clements of the Beaver County District Attorney's Office Detective Bureau proceeded to Baltimore to interview Smothers. The defendant alleges that Smothers had previously testified before the grand jury and that the detectives were hoping to obtain her testimony against him. Detective Patrick had Smothers listen to tape recordings of various telephone calls

26

between her and the defendant, and also between Hampton, the defendant's girlfriend in Pittsburgh, and the defendant, resulting in Smothers changing her statement to assist the investigation.

Detective Patrick related that Smothers was combative from the initial contact and confirmed that he had her listen to the telephone calls between her and the defendant to demonstrate to her that investigators were aware of the telephone communications. Detective Patrick further testified that he had Smothers listen to telephone calls between the defendant and Hampton in which he spoke about having a life together with Hampton at the same time he was talking about having a life with Smothers. Detective Patrick further indicated that despite Smothers telling him that she had testified before the grand jury, he informed her that the police had follow-up questions to ask. Detective Patrick also displayed a photograph of the crime scene to emphasize that the police intended to continue their investigation into the Harper murders. In his testimony, Detective Patrick verified that Smothers confirmed her grand jury testimony as to the defendant and co-defendant visiting her at the end of June, 2008 and immediately departing after Burgess received a telephone call at which time the defendant said to her "Hey, Babe, I got to go home. I got to get my money. They're messing with my

27

money". At no time did Smothers indicate that she was threatened or coerced in any manner.

With respect to the Commonwealth witness Hampton, who was the mother of the defendant's child, the defendant avers that Hampton changed her story and gave information to the police that they wanted after the detectives once again had her listen to telephone calls between her and the defendant, as well as between Smothers and the defendant, and showed her a photograph of the crime scene.

Detective Patrick advised that he interviewed Hampton immediately after arriving in Pittsburgh from the Smothers meeting in Baltimore in March, 2012. Detective Patrick advised that Hampton was cooperative to a point, however, she was reluctant since she and the defendant were parents of a daughter. Detective Patrick further testified that he met on several occasions with Hampton. In her testimony, Hampton stated that she felt pressured by Detective Patrick and felt she was being harassed because he talked to her a number of times. She admitted that the tape recordings of the telephone calls angered her. Burgess directed Hampton to file harassment charges against Detective Patrick. Hampton's statements to Detective Patrick were consistent with what she had previously indicated to Agent Ferentino on December 2, 2011.

The record is devoid of any threats, false representations, deception or trickery used by Detective Patrick in interviewing Beasley, Smothers and Hampton. All three witnesses voluntarily agreed to speak with the officers. The court determines that Detective Patrick's conduct in interviewing the witnesses was within the normal course of a criminal investigation and did not constitute outrageous government misconduct so as to establish a violation of the defendant's due process rights.

## ALLEGED ERROR/ABUSE OF DISCRETION IN REFUSING REQUEST FOR MISTRIAL BY REASON OF ALLEGED REFERENCE TO DEFENDANT AS GANG MEMBER

The defendant next alleges that the court abused its discretion in refusing to grant a mistrial on the basis that Agent Maurice Ferentino testified the defendant was a gang member or associated with a gang, and that such testimony violated Rule 404(b) of the Pennsylvania Rules of Evidence, 42 Pa. C.S., prohibiting evidence of a crime, wrong or other acts and requiring notice from the Commonwealth of its intended use of such evidence.

In response to the assistant district attorney's inquiry regarding the significance of the user name of "raw 1728" on the defendant's computer from which the airline ticket was purchased for Demetria to travel to El Paso, Texas to

29

obtain marijuana, the following direct testimony and cross-examination of Agent

Ferentino reveals evidence contrary to the defendant's allegations:

### BY MS. POPOVICH:

Q.   Now, you were also present for the testimony involving the purchasing of the plane ticket; is that correct?

A.   The plane ticket?

Q.   To Texas.

A.   Oh, yes.

Q.   And the use of the computer that we have as Commonwealth's Exhibit No. 74?

A.   Yes.

Q.   And you heard that the user account was "raw1728"?

A.   Yes.

Q.   Does that have any significance to you?

A.   Yes.

Q.   Okay. First of all, the "raw" part?

A.   The "raw" being Mr. Burgess.

Q.   Okay. What does 1728 mean to you?

A.   1728 is, I know I just spoke to the jury regarding the gang members that we, as ATF, indicted in 2010. 1728 or 28 was

30

popular among the gang members. They would wear tattoos that said 1728 or 28.

I know this from both the gang members that were indicted and cooperating informants in that investigation that 1728 referred to an abandoned house on Brighton Place, a street in the North Side of Pittsburgh where gang members would congregate, fight dogs, stash drugs, and weapons.

MR. SHAHEN: Objection, Your Honor. May we approach side bar?

(WHEREUPON, the following proceedings were had at side bar:)

MR. SHAHEN: Your Honor, I, at this point my objection is based upon the answers given by the agent whereas a reference to gangs and gang related symbols. I don't know, first off, based upon the fact that that, that he is now associating Mr. Burgess with a gang under the circumstances where I was never given a definition of Rule 7 what 1728 is.

I don't, even if I was, Your Honor, by asking that question and taking that information and putting it before the jury I think we have created a situation now of the jury knowing or believing or being told that my client is a member of a gang warrants a mistrial, and for that reason, Your Honor, I would ask for a mistrial.

MS. POPOVICH: Your Honor, I am not illiciting the testimony to say he was part of a gang. My next question was going to be we are not here saying he was part of a gang. However, there was testimony, and this was all brought out through cross-examination of Margarette Moore, that the other individuals that he associates with, Devon Shealey, the tall dark individual, that they were gang members. They are serious. They are gang members. That all came out through Margarette Moore's testimony. This is just showing

31

knowledge of Shealey, and it goes with his knowledge of Devon Shealey.

MR. FARRELL: So Shealey is part of RICO?

THE COURT: What are you intending to do next?

MS. POPOVICH: Actually my next question is we are not here saying that Robert Burgess is a member of the gang.

MR. QUINN: It may even lead into, because Shealey was a part of RICO that this affiliates him with the RICO, this 1728.

MR. SHAHEN: Your Honor, my fellow wasn't even charged.

MR. QUINN: I didn't mean affiliated. Burgess, it shows him that he's aware of the gang members. As she said Shealey is a part of RICO, being a part of the gang member, and –

THE COURT: Well, whether Shealey is a part of gang members or not I don't think is relevant, so I don't know that I'm going to let you get into that. The question you indicated you are going to ask I will permit.

MS. POPOVICH: Um-hum.

THE COURT: Your motion for mistrial is denied.

(WHEREUPON, the side bar proceedings were concluded, and thereafter the following proceedings were had in open Court: )

THE COURT: Miss Popovich.

## BY MS. POPOVICH:

Q. And, Agent Ferentino, just to clarify we are not here testifying today that Mr. Burgess was part of a gang?

32

A. No. You asked me if the number 1728 had any significance to me, and I answered your question.

Q. Okay.

**CROSS-EXAMINATION BY MR. SHAHEN:**

Q. Good morning, Agent Ferentino.

A. Good morning.

Q. I want to make it clear for everybody that you're speaking to in this courtroom that when you mentioned 1728 and what it stands for, you in no way and in no manner intended to tell this jury that Mr. Burgess was a member of any gang, is that true?

A. Miss Popovich asked the question if 1728 had any significance to me, and I answered the question.

(T.T. Volume XII, Pages 109-114)

Rule 605 of the Pennsylvania Rules of Criminal Procedure, 42 Pa. C.S., sets forth the requirements for a mistrial, as follows:

> (B) When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion shall be made when the event is disclosed. Otherwise, the trial judge may declare a mistrial only for reasons of manifest necessity.

A mistrial is an extreme remedy and is required only when the incident is of such nature that the unavoidable effect is to deprive the defendant of a fair trial. *Commonwealth v. Montalvo, 434 Pa. Super. 14, 38, 641 A.2d 1176, 1188 (1994)*

33

(Citations omitted). "Prejudicial", in the context of a motion for mistrial, denotes an event which may reasonably be said to have deprived the defendant of a fair and impartial trial. *Id.*, citing *Commonwealth v. Larkin, 340 Pa. Super. 56, 63, 489 A.2d 837, 840-841 (1985).* The specific test to be applied upon a motion for mistrial is whether improper evidence was admitted at trial, such as would so compromise the fact-finder that it would be unable to remain impartial, thereby prejudicing the defendant beyond a reasonable doubt. *Id.*, citing *Commonwealth v. Dean, 300 Pa. Super. 86, 91, 445 A.2d 1311, 1313 (1982).* A mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. *Commonwealth v. Rega, 593 Pa. 659 , 692, 933 A.2d 997, 1016 (2007), Commonwealth v. Simpson, 562 Pa. 255, 754 A.2d 1264, 1272 (2000).*

In the present case, Agent Ferentino clearly testified on both direct and cross-examination that he was not indicating that Burgess was a gang member. The defendant has therefore failed to demonstrate the prejudice required to deprive him of a fair and impartial trial to warrant the extreme remedy of a mistrial.

## ALLEGED ABUSE OF DISCRETION IN REFUSING REQUEST FOR MISTRIAL BY REASON OF REFERENCE TO DEFENDANT BEING ON PAROLE

The defendant further argues that the court abused its discretion in denying his request for a mistrial upon the Commonwealth witness, Margarette Moore, testifying on direct examination that the defendant was on parole.

Moore, in cooperation with the police, had arranged to return the defendant's car to him in Ambridge, Beaver County. Moore indicated that the defendant wanted to meet in Leetsdale, Allegheny County. In response to the assistant district attorney's question as to the reason that the defendant desired to meet in Leetsdale rather than Ambridge, Moore testified "I guess because he was on parole or something. He wasn't allowed out of Allegheny County." Defense counsel objected and at side bar requested a mistrial which the court denied on the basis that extensive relevant testimony was anticipated to be subsequently elicited regarding the defendant's incarceration on various other charges. In addition, the court refused the Commonwealth's suggestion for a cautionary instruction based upon the brief reference to the defendant being on parole as not being prejudicial to the defendant, and that giving such an instruction to the jury would only emphasize the passing remark. (T.T., Volume X, Pages 89-92).

35

Not all references which may indicate prior criminal activity require reversal. *Commonwealth v. Blystone, 555 Pa. 565, 580, 725 A.2d 1197, 1204 (1999)* (Citation omitted). Mere passing references to criminal activity will not require reversal unless the record indicates that prejudice resulted from the reference. *Id.* In view of the fact that subsequent relevant testimony revealed that the defendant had been incarcerated both at the Allegheny County Jail and the Northeast Ohio Correctional Facility for offenses unrelated to the instant charges, the passing reference of the defendant being on parole lacked the prejudice required to deny the defendant a fair trial and thus warrant a mistrial.

## ABUSE OF DISCRETION IN ADMISSION OF ALLEGED HEARSAY EVIDENCE

The defendant claims that the trial court abused its discretion in admitting hearsay testimony of Commonwealth witness Paillett that the co-defendant, Shealey, asked Paillett to have Burgess moved to the section of the jail where Paillett and Shealey were located while all of them were incarcerated at the Allegheny County Jail.

During discussions in chambers prior to Paillett testifying, the assistant district attorney indicated that Paillett would be questioned regarding his unsuccessful attempt to have Burgess moved to the same pod in the Allegheny County Jail where Paillett and Shealey were housed in November, 2008. (See

36

T.T., Volume XII, Pages 250-255). The court, over the defendant's hearsay objection, authorized the Commonwealth to examine Paillett as to his efforts to have Burgess relocated to their area of the Allegheny County Jail.

In his initial testimony, Paillett indicated that he had known Burgess and Shealey since the 1990's, and introduced Burgess and Shealey to one another in 2007. All three individuals were from the Northside neighborhood of Pittsburgh and were often in daily contact and in the company of each other in 2007 and 2008. The Commonwealth's examination of Paillett by the assistant district attorney concerning the three of them while inmates in the Allegheny County Jail consisted of the following:

## ISAIAH PAILLETT BY MS. POPOVICH

Q. Now, I'm going to move on now to November of 2008. Do you remember that timeframe?

A. Yeah.

Q. Where were you then?

A. Allegheny County Jail.

Q. And during that time period was Devon Shealey also incarcerated at the Allegheny County Jail?

A. Yes.

Q. And were you cellmates?

37

A.   Yes, we were.

Q.   How did that come to be?

A.   Well, he was on the pod that I, you know, later got to, 7, 7E, and I had asked a friend of mine to get me moved down there to the pod where he was at.

I got there. He had a celly in there with him at the time. You know, we made him move. I moved in, and we cellies for about close to, close to a year.

Q.   Okay. And what is a celly?

A.   Me and another guy living together, bunking up.

Q.   So --

A.   Bunkbed.

Q.   -- you and Mr. Shealey lived in the same cell?

A.   Right, bunkbed, desk, toilet, sink, that's it.

Q.   Okay. During that time period in early November, or after, while you're cellmates with Devon Shealey, do you learn that Robert Burgess ends up in the Allegheny County Jail?

A.   Yeah. I heard he was in the jail, and.

Q.   And at that point do you try to have him moved onto your pod?

A.   Yeah, I asked somebody to get him moved up, check the computer, see where he was at first, and she said that he was in the shoe. That's like the clinic. Everybody goes through there when you first come in. I asked her to get him moved up.

38

Q. But you ultimately learn that he is then later released from the Allegheny County Jail, and you weren't able to have him moved?

A. Yeah, later that day.

(T. T., Volume XIII, Pages 122-123).

The defendant avers that Paillett was permitted to testify that Shealey expressed to him that Shealey wanted Burgess to be moved closer to them in the Allegheny County Jail. However, during the Commonwealth's direct examination of Paillett, the assistant district attorney refrained from any reference that Shealey requested that Burgess be relocated to the cellblock in which Paillett and Shealey were inmates nor did Paillett indicate that Shealey wanted the defendant moved close to them. The assistant district attorney inquired of Paillett as to whether he learned that the defendant had been incarcerated in the Allegheny County Jail, and the subsequent actions he took in response to becoming aware of the defendant's incarceration. An out-of-court statement offered to explain a course of conduct is not hearsay. *Commonwealth v. DeHart, 512 Pa. 235, 254, 516 A.2d 6565, 666 (1986)* (prosecutor merely eliciting information as to the reason for a telephone call being made was not hearsay); *Commonwealth v. Cruz, 489 Pa. 559, 414 A.2d 1032 (1980)* (evidence of a police radio call offered to show how a police officer giving testimony came into contact with the defendant was admissible as not being hearsay since it was an out-of-court statement offered to explain a course of

39

conduct). Paillett learning of the defendant's admission to the Allegheny County Jail and his response in attempting to have the defendant moved to the same area as Paillett and Shealey do not constitute hearsay, and therefore, the defendant's argument is without merit.

## ALLEGED ERROR IN REFUSING TO CHARGE JURY ON DEFENSE OF DURESS

The defendant argues that the trial court erred in refusing to instruct the jury as to the defense of duress. In particular, Burgess alleges that Paillett testified that the co-defendant, Shealey, pointed a gun at him to force him to kill the female victim, Demetria.

The Crimes Code, 18 Pa. C.S. §309, sets forth the requirements for duress:

> (a) General Rule. It is a defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.

The elements necessary to establish the duress defense are immediate or imminent threat of death or serious bodily injury; well grounded or reasonable fear that the threat will be carried out; and no reasonable opportunity to escape threatened harm except by committing the criminal act. *Commonwealth v. Baskerville, 452 Pa. Super. 82, 681 A.2d 195 (1996), appeal denied 547 Pa. 723, 689 A.2d 230 (1997).*

40

In determining whether there is sufficient evidentiary support for a jury instruction on the defense of duress, a trial court considers all evidence presented, whether adduced by the defendant as part of his case in chief, through cross-examination, or, conceivably, in the Commonwealth's own case in chief. ***Commonwealth v. Markman, 591 Pa. 249, 916 A.2d 586 (2007).***

Contrary to the defendant's assertion, the following examination of Paillett fails to demonstrate that Paillett testified Shealey pointed the gun at Burgess and forced him to kill Demetria:

## ISAIAH PAILLETT BY MS. POPOVICH

Q.   Now, did he tell you specifically what was supposed to happen with drugs or money?

A.   Well, they did something once he said. Everything was good, something like just to see, you know, how it was going to go, and he gave him, he gave her a large amount of money and nothing came back, the money, the drugs, nothing.

Q.   Did he tell you where the drugs were supposed to come from?

A.   Texas.

Q.   So after he tells you that they have them lined up in the basement, what else does he tell you?

A.   Well, he said he was confronting her, and one of the kids had peaked out the door to see what was going on with their family. He said that Shealey told one, you know, the kid go back in there, everything will be already, just go back in, shut

41

the closet, and Shealey had lifted his mask up. That's basically a sign that, you know, let you know that you about to die, and.

Q. How do you know that?

A. Burgess told me that, told me he lifted his mask up.

Q. Now, you testified that you raised Shealey in the streets?

A. Right.

Q. You taught him how to be a thug?

A. Right.

Q. So to you, what does taking the mask off mean?

A. See my face, so you know, can't let you, can't, it's impossible to let you live.

Q. So after Burgess tells you that Shealey took off his mask, what does he tell you next?

A. He says Shealey shot him, shot the male, looked at Burgess while Burgess still had the lady at gun point, you know, as to say like, you know, what is you waiting on. Put him under the gun, so he shot her, and as they was exiting the house, he said, they was coming down the steps or whatever of the house, looked up. There was somebody looking out the window. I guess they heard the shot, and they just ran to the car.
(T.T., Volume XIII, Pages 128 – 130)

## ISAIAH PAILLETT BY MR. FARRELL

Q. And Burgess is telling you that these two people are standing there; right?

A. Right.

Q. And he's saying something to them?

A. Yes, he is.

Q. What is he saying when they're standing there according to him?

A. His words was, "You thought you was gonna get out on me for my stuff," his words.

Q. All right. And nobody said anything to them, did they?

A. To who?

Q. To Burgess.

A. He didn't say what they said back then the response.

Q. Well, he said he was doing all the talking, didn't he?

A. Exactly.

Q. And nobody else was talking? Shealey wasn't talking; correct?

A. Not at all.

Q. And the two people weren't talking; correct?

A. He didn't tell me what the people was saying in response. He told me what he was saying to them.

Q. Okay. And did he say Shealey got angry and pulled up his mask?

A. Yes.

Q. Enough is enough, I'm pulling up my mask?

43

A. Enough talking.

Q. Enough talking?

A. Yeah.

Q. Okay. And he says, Burgess says he pulls up his mask and Shealey pulls out that gun and shots them?

A. Well, one of the kids had came out.

Q. Okay. Yeah, you did say that.

A. Um-hum.

Q. Down in the basement one of the kids came out and they said go back in?

A. Right.

Q. And once that went in, once the mask went up, everybody knew what that meant?

A. Exactly.

Q. Lights are out?

A. Lights wear out.

Q. Shealey pulls out the gun, shoots them?

A. Shoots the man.

Q. Shoots the man?

A. Right.

44

Q. Did Burgess tell you why he shot the man?

A. That's what they were there for.

Q. For the man, shooting the man?

A. To both of them, that's what they were there for.
Q. The man was involved in this, both of them, both the male and the female were involved in this drug deal?

A. They wasn't gonna go up there and kill the lady that's for sure.

Q. Okay.

A. You know, if the kids was a little older, I'm pretty sure that something would have happened to them, too.

Q. So Shealey shoots the man?

A. Right.

Q. Shoots him in the head?

A. Right.

Q. As Shealey is looking at him, as I'm looking at this poor officer right here, eyeball to eyeball; right?

A. Eyeball to eyeball.

Q. And that's what he said?

A. Yep.

Q. And you remember that for sure?

A. Exactly.

45

Q.   And he pulls the trigger and he shoots him?

A.   Right.

Q.   Right in the head, boom?

A.   Yep.

Q.   How many times did he shoot him according to my client?

A.   Once.

Q.   Once?

A.   Um-hum.

Q.   Did you, did Shealey turn over and shoot the woman?

A.   No, sir.

Q.   No. Then what happened?

A.   It was Burgess' turn.

Q.   Burgess' turn?

A.   Yep.

Q.   Oh, it's your turn?

A.   It's his turn.

Q.   Okay.  You understand what's what this, I mean you sound like you, you know?

A.   It was Burgess' problem from the start, you know.

Q.   All right.

46

A.  So can't come this far and don't do nothing.

Q.  Okay.

A.  Yeah.

Q.  So does Shealey give him that gun?

A.  Yes, sir.

Q.  Does Burgess have his gun out already?

A.  Yes, sir.

Q.  Okay. And did Burgess say he shot the woman?

A.  Yes, he did.

Q.  Did he say anything happened, he just shot her?

A.  Well, Shealey, he said that Shealey, he said that, you know, he looked at him as to say, like, what are you waiting for, and –

Q.  So it was –

A.  -- put him under the gun.

Q.  So there was some time period?

A.  Right. Put him under the gun, and he shot her.

Q.  It wasn't like a pow, pow. It was a pow, hey, let's talk about this. I really don't want to do this?

A.  I know he didn't want to do it.

Q.  You know Burgess didn't want to do it?

47

A.   He's soft and he was put under the gun and he did it.

Q.   He's soft?

A.   Yeah, he's soft.

Q.   You know that?

A.   I know that for a fact.

Q.   These two people who were standing are now dead?
A.   Right.
     (T.T., Volume XIII, Pages 151-156).

## ISAIAH PAILLETT BY MS. POPOVICH

Q.   Now, you and Mr. Farrell spent some time talking about the, let's go back to when Shealey took his mask off?

A.   Right.

Q.   And Burgess told you that Shealey looked at him like it's your turn?

A.   Right.

Q.   Did he tell you why it was his turn?

A.   Because Shealey had did what he did, had to do, and you know, he was just basically waiting on him.

Q.   And did Burgess tell you basically how they got into that situation?

A.   Money that, with the lady?

Q.   Yeah.

48

A. To buy some drugs. Nay-Nay had introduced the two, said she was from Texas, and she could make something happen for him.
(T.T., Volume XIII, Pages 167, 168).

In reviewing all of the evidence presented, although the co-defendant, Shealey, was an active participant in the drug transaction and the murders, Burgess was clearly the leader. Burgess initially discussed with Demetria obtaining marijuana from Texas; permitted Demetria to utilize his computer to purchase the airline tickets; provided the funds to Demetria to purchase the marijuana; and maintained constant contact with Demetria while she was in Texas. Upon learning that a package had been delivered to Demetria's home, Burgess immediately departed from Baltimore with Shealey after telling his girlfriend, Smothers, "Babe, I got to go cause they f'ing up my money" (T.T., Volume XV, Pages 134-135). Burgess returned to Pittsburgh together with Shealey. Later that night, Burgess and Shealey drove to Beaver Falls and committed the homicides. As Paillett indicated, the situation with Demetria was the defendant's problem. Burgess and Shealey were friends. There was no evidence to indicate that Burgess feared Shealey, was controlled by him or was threatened in any way by Shealey. In addition, when questioned by Paillett at the Northeastern Ohio Correctional Facility about being scared, Burgess denied being afraid at the time of the shootings. There was no evidence demonstrating that Burgess was coerced by Shealey to shoot Demetria.

49

Under these circumstances, the court determined that the evidence did not support an instruction on duress (T.T., Volume XIII, Pages 126-127).

## ALLEGED ERROR IN REFUSING TO ALLOW WRITTEN JURY INSTRUCTIONS ON ALLEGED DEFENSES

The defendant claims error on the part of the trial court for denying his request to provide the jury with written instructions on alleged defenses.

Prior to charging the jury, the trial court advised counsel in chambers that due to the large number of charges contained in the information, the court intended to furnish each juror with a copy of the written instructions for each offense, to which both parties agreed. The defendant further requested that written instructions regarding the (1) defendant's statements, (2) credibility of witnesses and (3) corrupt and polluted source be given to the jurors, as they constituted defenses. The Commonwealth objected arguing that the above instructions were not defenses. Upon review of the language of Rule 646 (B)(1), the court denied the defendant's request on the basis that the instructions requested were evidentiary in nature and not defenses.

Rule 646 (B)(1) governing material permitted in the possession of the jury, provides as follows:

(B)    The trial judge may permit the members of the jury to have for use during deliberations written copies of the portion of the judge's

50

charge on the elements of the offenses, lesser included offenses, and any defense upon which the jury has been instructed.

(1) If the judge permits the jury to have written copies of the portion of the judge's charge on the elements of the offenses, lesser included offenses, and any defense upon which the jury has been instructed, the judge shall provide that portion of the charge in its entirety.

The court charged the jury on the manner in which to treat the defendant's statements, the general credibility of witnesses and specifically the corrupt and polluted source instruction but did not provide the jury with written instructions as to these evidentiary matters. Other than stating that the court's action was reversible error, the defendant has cited no authority for his position that the items he requested to be provided to the jury in writing constituted recognized defenses and the court has found none. The defendant's claim is therefore without merit.

BY THE COURT

_____ S.J.

JUDY R. ENSLEN
CLERK OF COURTS
2015 JUN 23 PM 2: 11
BEAVER COUNTY
PENNSYLVANIA

2015 JUN 23 P 1: 09
BY THE COURT